**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0026n.06

NO. 10-1636

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED

*Jan 09, 2012*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| CASSANDRA WILLIAMS, et al., | ) | |
| | ) | |
| *Plaintiffs-Appellees,* | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE EASTERN DISTRICT OF |
| | ) | MICHIGAN |
| PORT HURON SCHOOL DISTRICT, et al., | ) | |
| | ) | |
| *Defendants-Appellants.* | ) | |

**Before: MOORE and ROGERS, Circuit Judges; and HOOD, District Judge.**[*]

HOOD, District Judge. Defendants-Appellants filed this interlocutory appeal following the district court's denial of qualified immunity to individual Defendants Michael Jones, Former Superintendent of the Port Huron School District; Craig Dahlke, Port Huron Northern High School Principal; and Port Huron Area School District Board of Education members, Jeffrey Stout, Thomas Crosby, Rasha Demashkieh, Geoffrey Hering, Charles Meeker, and Anna Kovar. Plaintiffs claim that these individual defendants violated Plaintiffs' right to equal protection under the Fourteenth Amendment when they acted with deliberate indifference to student-on-student racial harassment in violation of 42 U.S.C. § 1983.

For the reasons that follow, Defendants Jones, Dahlke, and the individual school board members were entitled to qualified immunity. Accordingly, we **REVERSE** the District Court's

---

[*]The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

decision with respect to Dahlke, Jones, and the individual school board members and **REMAND** this matter for further proceedings.

## I. Procedural Background

In their Complaint, the parents or guardians of twelve then-students[1] ("Plaintiffs") of Port Huron Northern High School ("Port Huron Northern") allege that the students were deprived of an equal educational opportunity as the result of "student on student" racial harassment experienced at the school in violation of Title VI, state law, and 42 U.S.C. §1983.[2] Defendants filed this interlocutory appeal following the district court's denial of qualified immunity to them with respect to Plaintiffs' claim that these individual defendants violated 42 U.S.C. §1983 by being deliberately indifferent to student on student racial harassment in such a way as to deny Plaintiffs' right to equal protection under the Fourteenth Amendment. Defendants also argue that this Court should exercise pendent appellate jurisdiction and review the trial court's decision to deny summary judgment on the Plaintiffs' remaining claims under Title VI of the Civil Rights Act of 1964 ("Title VI"); the Michigan Elliott Larsen Civil Rights Act, MCL 37.2102(a), *et seq*.; the Michigan Equal Accommodation Act, MCL 750.146, *et seq*.; and claims of intentional infliction of emotional distress.

---

[1]   While Darcy Hayes was substituted as a party after she reached the age of majority, the remaining students continue to be represented by a parent or guardian. For ease of reference, however, the students will collectively be referred to as "Plaintiffs."

[2]   As discussed more fully below, the Court declines to exercise pendent appellate jurisdiction over the trial court's decision to deny summary judgment on the Title VI and state law claims.

## II. Factual Background

The Port Huron Area School District has two primary high schools, Port Huron Northern and Port Huron High School ("Port Huron High"). Plaintiffs' allegations focus on events occurring during 2003 through 2006, but they report a history of racial harassment dating at least back to the 1990s. Eight student Plaintiffs remain in the action - Phillip Jones, Jansyn Southgate Smith, Natasha Thames, Joshua Portis, Gregory Harrison, Zenia Hayes, Kevina Jackson, and Darcy Hayes.

As Plaintiffs tell it, the time period from 2003 to 2006 was fraught with racial tension at Port Huron Northern. In 2003, the principal of Port Huron Northern was Cheryl Wojtas ("Wojtas"). In addition to the principal, there were three assistant principals, Marla Philpot ("Philpot"), Chip Mossett and Gregg Wagner, all of whom had authority to suspend and recommend expulsion for racial harassment. It is undisputed that administrators were aware of peer on peer as well as other forms of racial harassment. Indeed, administrators were not immune from this onerous conduct. For instance, when she was hired in 2003, Philpot was the only black professional employee at the school, and, within her first week at Port Huron Northern, she found Ku Klux Klan paraphernalia and white supremacist literature placed on or around her desk. That school year, both students and parents called Philpot a "nigger," including one parent who came to the school using racial slurs and seeking to assault Philpot after Philpot disciplined her son. It is against this backdrop that we consider the plaintiffs' claims.

Students at the school experienced similar harassment, even in front of their teachers. For instance, Plaintiff Darcy Hayes' Algebra teacher was aware that another student said to him, "Fuck you, fat nigger," but there was no investigation of the incident or discipline of the offending student. Nonetheless, Hayes started giving Principal Wojtas and Assistant Principal Philpot the names of

3

students using racial slurs, but Wojtas told him there was nothing she could do unless she heard the statements. Hayes went to Wojtas fifteen to twenty times over a period of a year and a half. On numerous occasions, according to the plaintiffs, teachers overheard use of the term "nigger" between students, but did not acknowledge its use in any way. During this time there were also several student vehicles that displayed Confederate flags, despite complaints that the flags were offensive. There were also several instances of vandalism on school grounds involving racial slurs as graffiti.

Parents approached several administration members in hopes of improving the situation. During a conversation related to the harassment, Philpot told Darcy Hayes' mother, Belinda Rivera ("Rivera"), that "there was racism there, she was aware of it, but there was not much that she could do about it, because she had made her concerns" known to Wojtas, who had not responded. Prior to 2005, Patsy Chapman, the mother of Plaintiff Josh Portis, who was regularly called a "nigger" and otherwise harassed due to his race, often resulting in physical violence, complained to Assistant Principal Mossett. Assistant Principal Mossett said it was difficult to do anything because it was Portis' word against the other student(s).

From 2003 to 2005, while Wojitas was principal, little, if anything, was done to investigate numerous allegations of the use of racial slurs between students or defacement of school property with racially offensive language, despite efforts by students and parents to keep Wojitas and the assistant principals informed of these incidents. In fact, Port Huron Northern has not produced any records of investigations or disciplinary actions taken regarding any of the incidents that occurred between 2003-2005.

Things began to change in 2005. Jones became the Superintendent of the district for the 2005-2006 school year. Dahlke was hired as principal of Port Huron Northern shortly after the start

4

of the 2005 school year, once Wojtas was promoted to Assistant Superintendent.[3] In June 2005, the Board approved a Student Code Handbook, which included a policy addressing harassment perceived to be motivated by race. For a first time violation, the policy required that parents be notified of their child's offending behavior, that the parties take part in a conference, and that the responsible student serve time in detention and possibly face more severe discipline. There is no evidence that there was a similar policy in place before June 2005. There is also little evidence that the policy, once in place, was strictly enforced.

On October 26, 2005, within days of Dahlke's start date, a racist poster was left on Tiara Long's locker. The poster included a Confederate flag and the words "Rebel - The south will rise - Death to all Niggers," and "If this offends you screw off, & get bent!" The next day, she found another racist note inside her locker. Shortly thereafter, the word "nigger" was scrawled on Long's locker. Dahlke removed the slur and, in an effort to catch the responsible party, Dahlke placed a hidden camera in a nearby classroom and personally monitored the area. His efforts were not successful. Dahlke and Long's mother contacted police to investigate the incident.[4]

On November 4, 2005, Dahlke recorded a video and played it over the school's in-house video monitor. He displayed the racist poster found in Long's locker and reminded the students the behavior was inappropriate. Dahlke also asked students to come forward if they had information

---

[3]    While Dahlke was not affiliated with Port Huron Northern as principal until 2005, he did teach at the high school in the 1990's and served as an assistant principal there between 1996-2001.

[4]    Dahlke then received a letter from Long's parents telling him their daughter had heard daily racial slurs during the prior school year, which had been reported. Dahlke acknowledged that he knew that "things had been going on with the 'word' since the prior school year" based on information received from Philpot.

about the person responsible for the drawing. Two students came forward. The drawing apparently had been stolen from the artist, and another person placed it in Long's locker. The artist, who by that time was incarcerated in a juvenile detention facility on unrelated offenses, was expelled. However, the individual responsible for putting the poster in the locker was never identified.

Reports of the use of racial slurs between students, in the hallways and in front of teachers who failed to discipline the offending students, continued during the 2005 - 2006 school year. There were also additional complaints of racial slurs and Confederate flags drawn in textbooks and used as graffiti around the school. In one instance, Kevina Jackson found a Confederate flag drawn in her textbook. Her teacher, Ms. Kearns, "looked at it and she told me that wasn't the first time she had seen something like that." Jackson had to continue using the book.

Finally, on November 7, 2005, Philpot wrote Dahlke:

A number of African American students have expressed to me their desire to take matters into their own hands re: the racial climate of the school. . . . [W]e should meet with them.

Shortly thereafter, on November 8, 2005, Dahlke held a meeting for minority students. The group discussed how some of the Plaintiffs used "nigger" and its derivatives at school. Dahlke surmised that this led white students to also use the word. Dahlke told the minority students not to use the word and to report its use when they heard it. Darcy Hayes testified that when white students learned of the meeting, that some cracked jokes, asking if it was a "nigger meeting" or "only niggers allowed."

Ultimately, Philpot formed a group of concerned parents and community members to advise Dahlke and brainstorm ideas to address the racist locker incidents and broader diversity issues at the school. Along with Philpot and Dahlke, the group included the local NAACP President, a retired

6

principal, a staff member, both of whom were black, a pastor, and the parents of some of the student Plaintiffs. There is no dispute that Dahlke approved of and participated in the group.

Also, shortly after the locker incident, a staff member advised Dahlke that several vehicles in the student parking lot had depictions of Confederate flags on or inside the vehicles. Dahlke determined the identity of the drivers of those vehicles and immediately sent them to their cars to remove or cover the stickers so that they were not visible. When Dahlke saw the Confederate flag on students' clothing, he directed them to remove the offending item or face disciplinary action. This occurred on several occasions. However, there is no evidence that any of these students were disciplined or that their parents were notified of their behavior.

Beginning in September 2005, Chapman began having conversations with Superintendent Jones about racial slurs used at the school, giving several examples and explaining that both her sons heard the word "nigger" in school. She had one or two face-to-face conversations, and one or two phone conversations with Jones about the racial slurs. When Chapman saw no change, she decided to go to the School Board. On November 21, 2005 and December 19, 2005, Chapman addressed the Board regarding persistent racial harassment at Port Huron Northern. Board members Crosby, Demashkieh, Hering, Kovar, Meeker and Stout were present at both meetings. At the November meeting, Chapman told the Board about (1) seeing and reporting the truck with the Confederate flag, (2) the racial slurs, (3) continued use of the word "nigger," and (4) racist graffiti. At the December meeting, Chapman displayed a blow-up picture of the "Death to all Niggers" poster and distributed copies to each board member. The Board did not direct any specific response to Chapman's concerns.

The racial incidents continued in 2006. Indeed, in April or early May 2006, Philpot discovered a textbook littered with racist statements and drawings. The first page of the list had "KKK" and "I will kill all of you" written on it. The following page, entitled "Hit List," had a noose and a numbered list of names, including Plaintiffs Hayes, Natasha Thames, Kevina Jackson, Portis, and Phillip Jones. Philpot's name appeared third on the list. Other images and messages followed a similar theme. The words "I beat Niggers to death with these" were coupled with an image of a rowing oar, "Die bitch nigga" accompanied Philpot's name, as well as images of swastikas, and numerous threats to kill African-Americans. Another page has the statement, "kill all the little nigglets." There was also a second "Hit List" in the book, which lists several Plaintiffs.

Philpot found the book in her office and flipped through it before showing it to her secretary and Dahlke, but for several days no one realized that the "Hit List" was in the book. Then, on or about May 12, 2006, Dahlke told Jones of a threat received, which stated that someone was going to shoot everyone on the "Hit List" contained in the book. Frightened for their safety, some Plaintiffs stayed home for several days after discovery of the "Hit List." The police were notified, but their investigation did not identify the author of the "Hit List."

Port Huron Northern then hired a group of management consultants to conduct a study on the learning environment at the school and provide findings and recommendations. In their report, the consultants determined that the racially charged atmosphere developed at Port Huron Northern over an extended period of time and was the result of a series of events, rather than a single episode. The consultants opined that policies regarding student conduct, including racial slurs, were not uniformly enforced by Port Huron Northern staff, and the absence of firm, decisive action encouraged continued harassment.

8

At the suggestion of the consultant team, Dahlke held three grade-level assemblies at the end of the 2005 - 2006 school year, during which Dahlke reminded the students that everyone should be treated with respect and dignity. Dahlke offered anonymity and protection from retaliation for students who reported violators. Port Huron Northern experienced an increase in reports of violations for the 2006 - 2007 school year. However, the racial slurs and incidents continued that school year.[5]

## II. Standard of Review

"We review the denial of summary judgment on grounds of qualified immunity de novo because application of this doctrine is a question of law." *McCloud v. Testa*, 97 F.3d 1536, 1541 (6th Cir. 1996) (citation omitted). Thus, a grant of summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden is met simply by showing the Court that there is an absence of evidence on a material fact on which the nonmoving party has the ultimate burden of proof at trial. *Id*. at 325. The burden then shifts to the nonmoving party to "come forward with some probative evidence to support its claim." *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). The Court's function is not to weigh the evidence, but to decide whether there are genuine issues for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Multimedia 2000, Inc. v. Attard*, 374 F.3d 377, 380 (6th Cir.

---

[5]  Plaintiffs argue that the exodus of black students from Port Huron Northern is the clearest proof that racial harassment interfered with their education. For the 2006 - 2007 school year, approximately 15 black students transferred from Port Huron Northern to Port Huron High. Several others dropped out or left the school district altogether.

9

2004). In determining whether there are genuine issues of material fact, the evidence should be construed in the light most favorable to the nonmoving party when deciding whether there is enough evidence to overcome summary judgment. *Anderson*, 477 U.S. at 255; *Summers v. Leis*, 368 F.3d 881, 885 (6th Cir. 2004).

## III. Discussion

### A. Jurisdiction

Plaintiffs argue that this Court does not have jurisdiction to review this interlocutory appeal because the defendants dispute some of the material facts. However, as this Court has frequently observed, "[i]f . . . aside from the impermissible arguments regarding disputes of fact, the defendant[s] also raise[ ] the purely legal question of whether the facts alleged . . . support a claim of violation of clearly established law, then there is an issue over which this court has jurisdiction." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005) (internal citations and quotation marks omitted). Accordingly, this court will interpret the facts in a light most favorable to plaintiffs, thereby "obviating the need to dismiss the entire appeal for lack of jurisdiction." *Id.*

### B. Individual Defendants Dahlke and Jones were entitled to qualified immunity because they were not deliberately indifferent to racial harassment at Port Huron Northern.

To determine whether the individual defendants are entitled to qualified immunity, the court must determine whether, considering the allegations in a light most favorable to the injured party, a constitutional right has been violated, and whether that right was clearly established at the time of the alleged violations. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Qualified immunity shields government officials from "liability for civil damages insofar as their conduct does not violate clearly established . . . constitutional rights of which a

reasonable person would have known." *Humphrey v. Marbry*, 482 F.3d 840, 846 (6th Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The qualified immunity doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Id*. at 847.

Plaintiffs allege that they were deprived of an equal educational opportunity as a result of unchecked student on student racial harassment known to the defendants, in violation of the 14th Amendment. However, to demonstrate a violation of the Fourteenth Amendment's Equal Protection Clause, Plaintiffs must demonstrate Defendants' racially discriminatory intent with respect to their response to the student on student harassment. *Gant ex rel. Gant v. Wallingford Bd. of Educ.,* 195 F.3d 134, 139-40 (2nd Cir. 1999) (citations omitted). Defendants must have been deliberately indifferent to the allegations of student-on-student racial harassment.[6] *See id.* "Deliberate indifference to discrimination can be shown from a defendant's actions or inaction in light of known circumstances." *Id.* at 141.

"[A] plaintiff may demonstrate defendant's deliberate indifference to discrimination 'only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances'" *Vance v. Spencer Cnty. Pub. Sch. Dist.,* 231 F.3d 253, 260 (6th Cir. 2000) (quoting *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999)). These claims do not require proof that "the defendant fully appreciated the harmful consequences of that discrimination, because deliberate indifference is not the same as action (or inaction) taken maliciously or sadistically for the very purpose of causing harm." *Gant*, 195 F.3d at 141.

---

[6]     The "deliberate indifference" standard for use in these cases is "substantially the same" as the deliberate indifference standard applied by the Sixth Circuit to Title IX cases. *Williams v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 369 (6th Cir. 2005).

**i. Dahlke**

As an initial matter, the district court erred when it denied Dahlke qualified immunity. Considering the facts construed in the plaintiffs' favor, he was not deliberately indifferent to student-on-student racial harassment and, therefore, did not violate the plaintiffs' constitutional right to equal protection under the law. *See Gant*, 195 F.3d at 140 (citing *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1249-51 (10th Cir. 1999)). Determining whether such a violation exists is one of the two steps in the qualified immunity analysis. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

As the district court discussed, Dahlke made extensive efforts to combat student-on-student racial harassment after being hired as principal in October 2005. For example, Dahlke (1) removed a racial slur from a locker, (2) set up video surveillance in locations where harassment occurred, (3) reported serious incidents of harassment to the police, (4) ordered students to remove depictions of Confederate flags from their vehicles and clothing, (5) participated in a group dedicated to improving the situation at Port Huron Northern, alongside other members of the community, (6) gave a presentation over the school's video system regarding inappropriate behavior, (7) expelled a student who created a racist poster, (8) told minority students to report students who used racist language, (9) told the superintendent about a threat related to a hit list, (10) hired management consultants to conduct a study on the learning environment at the school, (11) investigated reported incidents of harassment and (12) held three grade-level assemblies at which he told the students to treat everyone with respect and dignity and offered anonymity and protection to students who reported violators. Dahlke's various efforts were not "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648.

The plaintiffs argue, nonetheless, that Dahlke was deliberately indifferent because, among other things, he did not mandate that all teachers take action in response to hearing slurs, did not meet with students who overheard or were the subject of racial slurs, did not tell students how to file a complaint of harassment, and did not discipline anyone for creating the hit list. Plaintiffs further criticize Dahlke's perceived delay in taking action. But the plaintiffs "do not have a right to particular remedial demands," and Dahlke was "not required to remedy [racial] harassment nor . . . expel every student accused of misconduct." *Vance*, 231 F.3d at 260 (internal citations and quotation marks omitted). Dahlke was required to "merely respond to known peer harassment in a manner that [was] not clearly unreasonable." *Davis*, 526 U.S. at 649 (emphasis added). While there appears to be some disagreement as to whether Dahlke should have responded to the incidents in a different manner or taken further steps to identify the offending students, no one disputes that Dahlke made efforts to address the racial harassment and solicited the assistance of others to formulate a strategy. If "a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior." *Vance,* 231 F.3d at 261. Dahlke did so by attempting several strategies to address the problems at Port Huron Northern.

Given Dahlke's numerous, varied responses to the racial harassment, he met the low threshold necessary to show that he was not deliberately indifferent to the racial harassment at the school. Even the district court acknowledged that "Dahlke made significant efforts to address the racial issues at Port Huron Northern." In short, Dahlke was not deliberately indifferent to the student-on-student racial harassment and therefore, was entitled to summary judgment on the basis of qualified immunity.

13

### ii. Jones

Likewise, Jones, contrary to the determination by the district court, is also entitled to qualified immunity. Again, given the facts construed in the plaintiffs' favor, he was not deliberately indifferent to student-on-student racial harassment and, therefore, did not violate the plaintiffs' constitutional right to equal protection under the law. *See Gant,* 195 F.3d at 140 (citing *Murrell,* 186 F.3d at 1249-51).

There is evidence in the record that Dahlke and Jones discussed the racial harassment at Port Huron Northern, and that Jones was, at the very least, aware of Dahlke's efforts to remedy the situation. Jones approved the diversity training at Port Huron Northern, met with the local NAACP and arranged for Assistant Superintendent Wojtas to assist Dahlke with issues relating to the "hit list" incident. Moreover, he held two conferences to address parents' concerns and arranged for the consultants to evaluate the situation at Port Huron Northern. We are not persuaded that these actions are "clearly unreasonable in light of the known circumstances." *Vance,* 231 F.3d at 260.

Plaintiffs argue that this was not enough, however, because Jones only took these actions unwillingly, after he had ignored calls about the racial harassment from Chapman, Philpot and the NAACP. In fact, Plaintiffs argue that Jones was "openly hostile" to requests for action to address the problem. Just as the plaintiffs "do not have a right to particular remedial demands," the law does not require that Jones has to have a pleasant demeanor. *Id.* at 260. Plaintiffs do not dispute that Jones took the actions listed above and Jones need "merely respond to known peer harassment in a manner that [was] not clearly unreasonable" to show that he was not deliberately indifferent. *Davis,* 526 U.S. at 649. Jones efforts to remedy the longstanding racial harassment at Port Huron Northern were not clearly unreasonable, and he is therefore entitled to qualified immunity.

14

Having determined that neither Dahlke or Jones violated the plaintiff's right to equal protection, we need not address whether the right was clearly established. *See Binay v. Bettendorf*, 601 F.3d 640, 646-47 (6th Cir. 2010) (citing *Pearson*, 555 U.S. at 236).

**C. Individual school board members were also entitled to qualified immunity.**

The individual school board members were also entitled to qualified immunity because Plaintiffs have failed to show that the individual school board members violated a constitutional duty owed to Plaintiffs. *See Pearson*, 555 U.S. at 232. Plaintiffs allege that the individual school board members were deliberately indifferent to student-on-student racial harassment and claim that these individuals' inaction should subject them to liability. The school board members, however, cannot be held liable as individuals because they had no duty to act as individuals. Our conclusion of course does not mean that the same actions by persons with individual duties would be entitled to qualified immunity on the facts of this case.

This court has recognized that, under § 1983, an individual school board member can only be held liable for failing to act if the law "empowers him with some legal obligation to act." *Doe v. Claiborne Cnty., Tenn.*, 103 F.3d 495, 512 (6th Cir. 1996). No such obligation existed in this case because, under Michigan law, the duties of a school board are imposed on the entire board and not on the individual members. *See* MICH. COMP. LAWS § 380.11a. As in *Claiborne*, "the reality [is] that these board members were unable to act, in a legal sense, except as constituent members of a board majority." *Claiborne*, 103 F.3d at 512. Since the plaintiffs have failed to articulate any duty imposed on the school board members, as individuals, to address the student-on-student racial harassment at Port Huron Northern, Plaintiffs' § 1983 claim against the individual school board members must be dismissed.

15

**D. Pendent appellate jurisdiction over the Title VI and state law claims.**

Finally, this Court declines to accept Defendants' invitation to consider issues related to the Title VI and state law claims, which are not subject to independent interlocutory review, because they are not inextricably intertwined with the appealable claim and "review of these issues is not necessary to ensure meaningful review." *Lowe v. Hamilton Cnty. Dept. of Job & Family Srvcs.,* 610 F.3d 321, 324 (6th Cir. 2010) (citing *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35 (1995)). The factual underpinnings of the plaintiffs' claims take place over a number of years and involve a number of school administrators. Many of the facts relied upon for liability regarding the Title VI claim took place during 2003-2005, which was prior to individual defendants Dahlke and Jones service as Principal and Superintendent. Thus, the facts relating to the individual liability of the defendants on the § 1983 claim are a smaller subset of the facts underlying the Title VI cause of action against the school board as an entity. Moreover, Title VI liability may lie against the entity, regardless of whether this Court finds the individual actors liable under § 1983. Our determination has no bearing on the merits of Plaintiffs remaining claims. Thus, while the § 1983 claims subject to interlocutory appeal are intertwined, they are by no means "inextricably intertwined" with the Title VI and state law claims. *Brennan v. Twp. of Northville*, 78 F.3d 1152, 1157-58 (6th Cir. 1996)*; See Tucker v. City of Richmond, Ky.,* 388 F.3d 216, 264 (6th Cir. 2004). Accordingly, we need not and do not reach the plaintiffs' pending Title VI and state law claims.

**IV. Conclusion**

For the foregoing reasons, the district court's order is **REVERSED,** and this matter is therefore **REMANDED** for further proceedings consistent with this opinion.

**KAREN NELSON MOORE, Circuit Judge, dissenting.** Because I would affirm the judgment of the district court, I respectfully dissent.

## I. DALKE AND JONES

Dalke and Jones appeal the district court's denial of summary judgment on the grounds of qualified immunity. At this stage of the litigation, Plaintiffs are not required to prove definitively that Dalke and Jones are not entitled to qualified immunity; they "must show only that a reasonable jury *could*" reach this conclusion. *Patterson v. Hudson Area Sch.*, 551 F.3d 438, 450 (6th Cir. 2009). Thus, Dalke and Jones bear the burden of demonstrating "that there is no genuine issue as to any material fact" with respect to the qualified immunity defense, and we must "draw[] all reasonable inferences in favor of the non-moving party" in deciding whether they have met this burden. *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011). The parties primarily dispute whether, as a matter of law, Dalke and Jones were deliberately indifferent to the student-on-student racial harassment suffered by Plaintiffs. I agree with the district court that, given the facts as pleaded by the Plaintiffs, a reasonable jury could conclude that Dalke and Jones were deliberately indifferent to the harassment at Port Huron Northern.

The standard for deliberate indifference "announced by the Supreme Court is a 'clearly unreasonable response in light of the known circumstances.'" *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 260 (6th Cir. 2000) (quoting *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999)). In applying this standard, we have recognized that if an individual has "actual knowledge that [his or her] efforts to remediate [harassment] are ineffective," yet "continues to use those same methods to no avail," he or she can be deemed deliberately indifferent and, thus, not entitled to qualified immunity. *Id.* at 261; *see also Williams v. Paint Valley Local Sch. Dist.*, 400

F.3d 360, 364 (6th Cir. 2005). In a recent decision denying summary judgment to a defendant school district in a Title IX case,[7] *Patterson v. Hudson Area Schools*, 551 F.3d 438, 448 (6th Cir. 2009), we held that when "a school district takes some action in response to known harassment, [but] further harassment continues, a jury is not precluded by law from finding that the school district's response is clearly unreasonable." *Patterson* recognized that when harassment is "severe and pervasive" and has "lasted for years," if the response taken is inadequate "to deter other students from perpetuating the cycle of harassment . . . a reasonable jury certainly could conclude" that "the school district's standard and ineffective response to the known harassment became clearly unreasonable." *Id.* at 447 (internal quotation marks omitted). Based on this precedent, I see no basis for concluding as a matter of law that Dalke and Jones are entitled to qualified immunity.

While it can be said that Dalke did more than his predecessor, who assertedly did nothing to address the student-on-student racial harassment occurring at Port Huron Northern, I do not agree with the majority's characterization of Dalke's efforts as "extensive," "numerous," and "varied." In fact, Dalke took even less action than the school district in *Patterson*, where at least perpetrators were given effective reprimands that stopped them from engaging in future harassment. *See id.* at 448. Dalke's actions, in contrast, consisted of half-hearted fruitless investigations and general reminders to the student body, which yielded no real results. In fact, the harassment not only continued under Dalke's watch—it escalated. Given this escalation in combination with Dalke's knowledge of the history of pervasive harassment at the school, a jury could find that Dalke's efforts were clearly unreasonable. *See id.* at 450 ("[B]ecause [defendant] had knowledge that its methods

---

[7]As the majority correctly recognizes, the Title IX deliberate-indifference standard is analogous to that applied by the Sixth Circuit in the Section 1983 context. *See Williams*, 400 F.3d at 369.

for dealing with the overall student-on-student sexual harassment of DP were ineffective, but continued to employ only those methods, the [plaintiffs] have shown a genuine issue of material fact as to the third part of the *Davis* test that is sufficient to defeat [defendant]'s motion for summary judgment.").

I also conclude that there are genuine issues of material fact as to whether Jones's response as superintendent was clearly unreasonable. As with Dalke, Jones was aware of the ongoing situation at Port Huron Northern from the beginning of his tenure and was in a position to ensure that it was properly addressed. However, Jones took only minimal and ineffective steps to counter the harassment and did nothing to adjust his approach when his efforts were unsuccessful. In fact, as alleged by Plaintiffs, Jones was unresponsive and hostile to requests for more effective responses. As with Dalke, given the history of harassment and its continued escalation and frequency, a reasonable jury could conclude that Jones's actions were "clearly unreasonable in light of the known circumstances." *Id.* at 450.

Accordingly, I would affirm the district court's judgment holding that Dalke and Jones are not entitled to summary judgment on the grounds of qualified immunity.

## II. SCHOOL BOARD

On appeal, Defendants argue for the first time that the individual school-board members are entitled to qualified immunity because, under Michigan law, the school board can act only as a collective entity and, therefore, its members cannot be held individually liable for its inaction. Because this argument was not made before the district court, I would hold that it is waived.

As the Supreme Court explained, "[w]hereas forfeiture is the failure to make the timely assertion of a right," and therefore still subject to plain-error review, "waiver is the intentional

19

relinquishment or abandonment of a known right" leaving no correctable error in its wake. *United States v. Olano*, 507 U.S. 725, 733 (1993) (internal quotation marks omitted). Qualified immunity is an affirmative defense and, therefore, is considered waived and abandoned if not affirmatively pleaded. *Moore v. City of Harriman*, 272 F.3d 769, 791-92 (6th Cir. 2001) (en banc) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982)); *see also Kennedy v. City of Cleveland*, 797 F.2d 297, 300 (6th Cir. 1986) ("Since [qualified] immunity must be affirmatively pleaded, it follows that failure to do so can work a waiver of the defense.").

Under the waiver doctrine, this Circuit has declined to address the merits of an argument in support of a qualified-immunity defense "raised for the first time on appeal unless the party shows that refusal to consider the argument would result in a miscarriage of justice." *Perez v. Oakland Cnty.*, 466 F.3d 416, 430 (6th Cir. 2006), *cert. denied*, 552 U.S. 823 (2007); *see also Ruffino v. Sheahan*, 218 F.3d 697 (7th Cir. 2000) (holding that defendant waived argument that particular point of law "was not clearly established" where defendant failed to present that argument to the district court despite "rais[ing] other arguments supporting [qualified] immunity"). Defendants do not address Plaintiffs' arguments regarding waiver, let alone provide reasons why treating this argument as waived would "result in a miscarriage of justice." *See Perez*, 466 F.3d at 430. Accordingly, it is not proper for this court to consider this argument or to reverse the district court's denial of qualified immunity to the individual school-board members on this ground.

Accordingly, I would affirm the district court's judgment holding that the school-board members are not entitled to summary judgment on the grounds of qualified immunity.