HARRY S. MATTICE, JR., UNITED STATES DISTRICT JUDGE
*551 This matter is before the Court on the Parties' cross-motions for summary judgment. [Docs. 172, 176, 177, & 178]. These consolidated cases were brought on behalf of two teenagers, the victims of hazing and sexual assault at their former high school. While on a school basketball trip, John Doe and Richard Roe, Jr.'s teammates held them down and sexually attacked them with a pool cue. Doe's attack was particularly gruesome because it resulted in him being anally penetrated with the narrow end of a pool cue, leaving him seriously injured. Doe's and Roe's parents, on behalf of their sons, brought claims against the Hamilton County Department of Education, some of its school administrators, and one of its teachers asserting Title IX, 42 U.S.C. § 1983, and state law tort claims. Plaintiffs allege, in sum, that Defendants were deliberately indifferent to Doe's and Roe's harassment in violation of their statutory and constitutional rights, and further that the school system and its agents were negligent.
Because the Court finds factual questions permeate Doe's and Roe's sexual assault, the Plaintiffs' Motion for Partial Summary Judgment [Doc. 178] is DENIED . Although those questions create a triable issue as to pre-assault deliberate indifference, after the assaults the Hamilton County Department of Education acted reasonably in its response by promptly punishing Doe and Roe's attackers and investigating the incidents. Further, the Court finds there are genuine issues of fact regarding whether the Department was constitutionally deficient in its relevant staff training. Accordingly, Hamilton County Department of Education's Motion for Summary Judgment [Doc. 177] will be GRANTED in part and DENIED in part . Likewise, there is insufficient evidence demonstrating the individual defendants in this action violated constitutional rights, and all are otherwise protected by qualified immunity. As such, Andre Montgomery, James Jarvis, and Jesse Nayadley's Motions for Summary Judgment [Docs. 172, & 176] are hereby GRANTED .
I. BACKGROUND
In 2015, John Doe ("Doe") and Richard Roe, Jr. ("Roe"), were freshmen at Ooltewah High School ("OHS"), a school administered by the Hamilton County Department of Education (the "Department"). There Doe and Roe participated in the school's basketball program. Most freshmen that aspired to play basketball at OHS were resigned to play on the school's freshman squad, but Doe's and Roe's skill earned them a spot on the varsity team. [Doc. 185 at 1]. What at first appeared to be an honor soon turned out to be a source of torment.
The OHS varsity team was allegedly rife with bullying and hazing. [Doc. 185 at 4, &
*552 186 at 5]. One favored form of hazing was what the players referred to as "racking-in" or the "rackings." [Doc. 179 at 2-3] Rackings consisted of upperclassmen beating freshman players in the team locker room with the lights out. [Doc. 185 at 3]. Three upperclassmen in particular were prominent "rackers," Students A, B, and C. [Doc. 185 at 2]. The three actually started the rackings once they joined the basketball team later that year, in November. [Id. ]. All four of the team's freshman players-Doe, Roe, and Students F and H-fell victim to the rack. [Doc. 185 at 3]. The frequency of rackings would vary per player; Doe says he was racked-in only once, but Roe claims he was put through the freshman rack multiple times per week. [Doc. 179 at 2]. Neither Doe nor Roe ever reported the rackings to school officials. [Doc. 173 at 5].
The varsity team's coach was Andre Montgomery ("Montgomery"), a defendant in this action. [Doc. 177-1 at 2]. Montgomery was also a teacher at OHS, and he had coached basketball at the school in some capacity since 2009. [Doc. 185 at 2]. Montgomery's office was next door to the team's locker room, and on more than one occasion he entered the locker room to find the players inside with the lights off. [Id. at 4-5]. His typical response consisted of him turning on the lights and yelling "knock off the horseplay." [Id. at 5]. Montgomery also occasionally punished players for hazing or horseplay. [Id. ]. Plaintiffs assert this is evidence Montgomery knew of the rackings. [Id. at 4]. Montgomery denies he had any such knowledge. [Doc. 173 at 4].
A. The Gatlinburg Trip
On December 19, 2015, the varsity team and Coach Montgomery traveled to the Gatlinburg, Tennessee area to participate in the "Smokey Mountains Christmas Classic" basketball tournament. [Id. at 3]. The trip was scheduled to last five days, with at least four overnight stays in Gatlinburg. [Id. ]. The team's fourteen players, Montgomery, his wife, his daughter, and an Assistant Coach, Karl Williams, would all stay in a single cabin, "JJ's Hideaway." [Id. ]. The cabin had two floors. [Doc. 185 at 5]. The boys were divided into three rooms in a downstairs area, and the adults and Montgomery's daughter stayed in two rooms upstairs. [Id. ]. When downstairs, the players were secluded from the adults, which effectively left them unsupervised. [See e.g. id. at 6]. Montgomery and Williams ventured down "only once or twice" during the entire trip. [Id. ] However, Montgomery claimed he could hear the players downstairs, including their conversations. [Doc. 185 at 7]. The downstairs area had a den that featured a billiards table. [Id. at 6]. Prior to and early on in the trip, Student B hinted to the freshmen that "something" was going to happen during the trip, and the upperclassmen would talk and joke about using pool cues on the freshmen, although at first Doe believed it was their intention to merely beat the freshman with the cues. [See Docs. 177-1 at 3, & 179 at 4]. Doe actually attempted to hide the pool cues to prevent their use. [Doc. 179 at 4]. Doe's efforts ultimately failed, however, and before the trip's end Students A, B, and C would use those pool cues to sexually assault the team's four freshmen.
Montgomery and Williams' laissez-faire approach to supervision is evidenced by their actions upon arriving at the cabin on December 19th. The two decided to go grocery shopping, leaving the players unsupervised for almost two hours. [Doc. 185 at 6]. The scene quickly devolved into a proverbial Lord of the Flies situation. [Doc. 179]. Once the adults left, upperclassmen shut off the cabin lights. [Doc. 185 at 6]. The freshmen scattered. Doe, *553 Roe, and another freshman sought shelter in a locked bathroom, where upperclassmen soon broke in, beat up the screaming freshmen, and drug them out. [Doc. 177-1 at 5]. Bands of upperclassmen then rounded up and threw fully clothed freshmen into the cabin's outdoor hot tub, on that cold December night. [Doc. 185 at 7]. Doe and Roe were among the victims. [Id. ].
The next night, December 20, 2015, the trip took an even darker turn. Upperclassmen found the hidden pool cues. Students A and C soon grabbed one of the team's freshman, Student F, and pinned him to the ground [Doc. 185 at 7]. While the two held him down, Student B took a pool cue and used it to prod Student F's anus, over his clothes. [Id. ]. Throughout the attack, Student F screamed. [Id. ]. Soon thereafter, Student A hunted down and grabbed Roe, wrestled him to the ground, and sat on his back to prevent his escape. [Id. ]. Then Student B, like he had done with Student F, placed a pool cue over Roe's clothes, between his buttocks, and "attempted to penetrate ... Roe's rectum" with the cue. [Doc. 177-1 at 6]. While Student B was doing this he was yelling "don't be a pussy," and "take it like a man." [Doc. 185 at 7].
The sexual assaults continued the next night, on December 21st. [Doc. 177-1 at 6]. After playing a game of pool, Doe heard Students A and C yell, "Get 'em" as they grabbed another freshman, Student H. [Id. ]. Doe fled the room and hid at the top of the cabin stairs. [Docs. 177-1 at 6, & 185 at 8]. From there Doe could hear Student H's screams as the upperclassmen used a pool cue to simulate sodomy on him as they had before. [Doc. 185 at 8].
The attacks came to a horrifying crescendo the night of December 22, 2015. That night, after dinner, Doe went downstairs to grab his cell phone. [Doc. 185 at 8]. There Students A, B, and C ambushed him. [Id. ]. They followed him into his room while holding a pool cue, and closed and locked the door. [Id. ]. Roe witnessed this while standing at the top of the stairs talking to Williams, and he reported what he was seeing. [Id. ]. Williams's response was "they better not be doing anything to him." [Id. ]. In the room, Students A and C held Doe down. [Doc. 177-1 at 7]. Student B then took the pool cue and forcefully rammed it into Doe's anus. [Id. ]. This was done over his clothes, as it had been done in prior attacks, but this time the ramming was so forceful that the cue ripped through two layers of Doe's clothing and actually penetrated him. [Doc. 185 at 8]. His attackers then ran away. [Id. ] Roe could hear Doe's screams from where he was standing. [Id. ]. Roe and Williams then ran into the room to find Doe lying on the floor, bleeding from his anus. [Id. ]. Coach Montgomery and his wife were called down to the room shortly thereafter. [Id. ]. Although he was in pain and bleeding, Doe was able to get up and clean himself off. [Id. ]. Montgomery then pulled Roe, Doe, and Student F the side and told them, "Keep this on the low," and "Don't let this get out," referring to the incident. [Id. ]. Apparently, this encouraged Doe to continue on the trip as if nothing had happened. Montgomery then began questioning the upperclassmen, and Student B admitted to Montgomery that he "had poked ... Doe 'on the bottom with a pool cue.' " [Doc. 177-1 at 7].
Sometime later that night, Doe began urinating blood. [Id. at 9]. Montgomery took him to the local emergency room. [Id. ]. During this, a Detective and two police officers from the Gatlinburg Police Department arrived at the cabin and began investigating the incident. [Doc. 177-1 at 7]. After their investigation, Montgomery called Students A's, B's, and C's parents, suspended them from the team, and *554 had them transported back to OHS. [Id. ]. The Department would eventually suspend and "zero tolerance[ ]" Students A, B, and C from school some time thereafter. [Id. at 8]. The next day, the remainder of the team, including Roe, competed in the last game of the tournament before going back to Ooltewah. [Id. ].
Back at the hospital, doctors had diagnosed Doe with a "full-thickness bladder injury," meaning the attack had perforated both his rectum and bladder. [Id. ]. Without surgery, Doe's injuries were life threatening. [Id. ]. Doe was transported by ambulance to another hospital, the University of Tennessee Medical Center in Knoxville. [Doc. 185 at 9]. There surgeons performed emergency surgery on Doe, repairing damage caused by the rape. [Id. ]. Doe remained hospitalized for six days, and after his release, he was bed bound. [Id. ]. He was unable to eat or use the bathroom, and had to re-learn to walk. [Id. ]. He did not fully recover until over nine months after his attack. [Id. at 10].
After the Gatlinburg incident, Doe never returned to OHS, choosing instead to transfer to another school. [Id. ]. Roe tried to continue attending OHS, but he claims the friends of his assaulters' harassed and threatened him at school. [Doc. 178-1 at 206]. Shortly after returning from Christmas break, he too decided to attend a different school. [Doc. 185 at 10].
B. Procedural Posture
On August 9, 2016, Doe's mother, Jane Doe (collectively the "Does" or "Doe Plaintiffs"), brought a lawsuit on behalf of her son. She asserted claims against the Department, and in their official and personal capacity: Montgomery, OHS Principal James Jarvis, and OHS Athletic Director Jesse Nayadley (collectively the "Individual Defendants"). [Doc. 1]. Likewise, on December 16, 2016, Roe's parents, Richard Roe, Sr., and Jane Roe (collectively the "Roes" or "Roe Plaintiffs"), brought claims against the Individual Defendants, the Department, and the Department's Title IX coordinator, Marsha Drake. [1:16-cv-497 ECF Doc. 1]. On August 3, 2017, District Judge Travis R. McDonough consolidated the Does' and Roes' cases. [Doc. 65]. On March 12, 2018, the Individual Defendants moved for summary judgment as to the Does' claims [Doc. 172] and Roes' claims [Doc. 176]. The Does and Roes both responded to the Individual Defendants' respective Motions for Summary Judgment on April 2, 2018. [Docs. 184 & 186]. On April 16, 2018, the Individual Defendants replied to the Doe Plaintiffs' response [Doc. 194] and Roe Plaintiffs' response [Doc. 195]. The Department and Marsha Drake also filed a Motion for Summary Judgment on March 12, 2018. [Doc. 177]. Plaintiffs responded separately. The Roes responded to the Department and Drake's motion on April 2, 2018. [Doc. 183]. The Does likewise responded to the motion on the same day. [Doc. 185]. All Plaintiffs filed a Joint Motion for Partial Summary Judgment against the Department on March 12, 2018. [Doc. 178]. The Department and Marsha Drake responded to the Plaintiffs' motion on April 2, 2018. [Doc. 182], and Plaintiffs replied in turn on April 9, 2018 [Doc. 192]. The Court finds that the issues in this matter have been fully briefed and are ready for disposition.
II. STANDARD OF REVIEW
Federal Rule of Civil Procedure 56 instructs the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting the presence or absence of genuine issues of material fact must support its position either by "citing to particular *555 parts of materials in the record," including depositions, documents, affidavits or declarations, stipulations, or other materials, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). When ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp. , 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ; Nat'l Satellite Sports, Inc. v. Eliadis Inc. , 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. Celotex Corp. v. Catrett , 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may discharge this burden either by producing evidence that demonstrates the absence of a genuine issue of material fact or simply "by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." Id. at 325, 106 S.Ct. 2548. Where the movant has satisfied this burden, the nonmoving party cannot "rest upon its ... pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." Moldowan v. City of Warren , 578 F.3d 351, 374 (6th Cir. 2009) (citing Matsushita , 475 U.S. at 586, 106 S.Ct. 1348 ; Fed. R. Civ. P. 56 ). The nonmoving party must present sufficient probative evidence supporting its claim that disputes over material facts remain and must be resolved by a judge or jury at trial. Anderson , 477 U.S. at 248-49, 106 S.Ct. 2505 (citing First Nat'l Bank of Ariz. v. Cities Serv. Co. , 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968) ); see also White v. Wyndham Vacation Ownership, Inc. , 617 F.3d 472, 475-76 (6th Cir. 2010). A mere scintilla of evidence is not enough; there must be evidence from which a jury could reasonably find in favor of the nonmoving party. Anderson , 477 U.S. at 252, 106 S.Ct. 2505 ; Moldowan , 578 F.3d at 374. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. Celotex , 477 U.S. at 323, 106 S.Ct. 2548.
III. ANALYSIS
A. Title IX Claims
Title IX of the Education Amendments Act of 1972 ("Title IX") states, in relevant part:
No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance ...
20 U.S.C. § 1681(a). There is no explicit reference to private suits for money damages in Title IX's text. See id. Instead, the United States Supreme Court has found such actions are implicit in the statute and its legislative history. Cannon v. Univ. of Chicago , 441 U.S. 677, 709, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). Title IX supports lawsuits brought for certain injuries caused by entities that receive federal educational funds. Id. Because Congress passed the law pursuant to its spending power, Title IX is contractual in nature and its extension of liability is appropriately viewed as a condition to the receipt of federal support, and in effect, schools consent *556 to permit themselves to be subject to Title IX liability when accepting federal funds. Gebser v. Lago Vista Indep. Sch. Dist. , 524 U.S. 274, 286-87, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998).
These precedents have stood for over a generation, and education departments and schools have long since been put on notice that opting to receive financial assistance from the federal government comes at a price: increased risk for liability. As is relevant here, this includes, "in certain limited circumstances," suits "for discrimination in the form of student-on-student sexual harassment. " Davis Next of Friend LaShonda D. v. Monroe Cty. Bd. of Educ. , 526 U.S. 629, 639-644, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (emphasis added). It is not the case, however, that the basis of such a claim derives from imputing a harasser-student's behavior to the fund recipient school. Id. at 645, 119 S.Ct. 1661. And when they accept federal funds, schools do not agree to be their students' insurers against any harassment they may face. See e.g. id. Rather, a school may be liable for its students' injuries under Title IX when it has "actual knowledge" of, and is deliberately indifferent to, "severe, pervasive, and objectively offensive" student-on-student sexual harassment that occurs " 'under' an 'operation' of the [school]." Id. at 646, 119 S.Ct. 1661. Doe and Roe assert this avenue of liability is applicable to their injuries.
Although they base their claims chiefly under Title IX, Doe and Roe's case is far from a prototypical Davis suit for deliberate indifference toward student-on-student harassment. Davis , for instance, involved a claim brought on behalf of a female student who was repeatedly sexually harassed over a period of "many months" by a male classmate. Id. at 633-34, 119 S.Ct. 1661. The Davis harasser's conduct occurred exclusively on school grounds, during school hours, and the victim and her mother notified school administrators of the ongoing harassment. Id. Despite her frequent reports, the school failed to effectively stop the victim's harassment, and her harasser eventually sexually assaulted her. Id. at 634, 119 S.Ct. 1661. By contrast, this claim involves conduct among students who are of the same sex. The most egregious conduct occurred far from school property, in a Gatlinburg cabin over one hundred miles away. Neither Doe nor Roe had reported harassment to anyone prior to their assault or rape, and if there were any actual, pre-assault knowledge of sexual harassment on the part of school officials, it was limited to two coaches, not a principal or other school administrator. Whether those facts support relief under Title IX requires careful attention to the Davis elements.
Title IX supports a suit for private money damages for student-on-student sexual harassment when:
(1) [there is] sexual harassment [that is] so severe, pervasive, and objectively unreasonable that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school, (2) the funding recipient had actual knowledge of the sexual harassment, and (3) the funding recipient was deliberately indifferent to the harassment.
Stiles ex rel. D.S. v. Grainger Cty, Tenn. , 819 F.3d 834, 848 (6th Cir. 2016) (citing Davis , 526 U.S. at 650, 119 S.Ct. 1661 ). The Department has not disputed its status as a federal fund recipient. Before the claim elements are further explored, however, it must be determined whether Roe and Doe's sexual assault and rape occurred " 'under' an 'operation' of" OHS, which was administered by the Department. Davis , 526 U.S. at 646, 119 S.Ct. 1661. School liability for student-on-student sexual harassment only extends to harassment *557 that occurs when the school has the authority to correct and/or prevent the offending behavior. See e.g. Gordon v. Traverse City Area Pub. Sch. , 686 F. App'x 315, 324 (6th Cir. 2017) (holding the defendant school could not be held liable for being deliberately indifferent toward students who "liked" a harassing Facebook post when there was no evidence those "likes" occurred during school hours). In other words, liability under Davis only attaches when alleged harassment happens "where the school 'exercises substantial control over both the harasser and the context in which the known harassment occurs.' " Id. (emphasis added) (quoting Davis , 526 U.S. at 645, 119 S.Ct. 1661 ).
It is an inescapable fact that the incidents alleged in this case occurred "under" a school "operation." Although Doe and Roe were sexually attacked far from campus and after the Department had ceased a majority of its operations for Christmas break, the boys were on a trip organized and sponsored by the Department. The trip's purpose was to promote the school's varsity basketball team and facilitate its competition in a holiday tournament. In order to ensure the team's well-being, including providing meals and transportation, the Department entrusted its agent, Montgomery, to care for the players. Further, it is without question that Montgomery and Williams had the authority to "control" the actions of Doe and Roe's harassers, and as the trip's chaperones, they had the ability to control the "context" of the harassment-e.g. they had the ability to control the players' conduct in the cabin. Davis , 526 U.S. at 645, 119 S.Ct. 1661 ; but see Pahssen v. Merrill Cmty. Sch. Dist. , 668 F.3d 356, 364 (6th Cir. 2012) ("When conduct occurs ... off school grounds entirely, the school district has control over neither the harasser, nor the context." (quoting the district court) ). Accordingly, the Gatlinburg trip and cabin stay are well within the school "operation[s]" that Davis contemplated. Id. at 646, 119 S.Ct. 1661.
1. Sexual Harassment So Severe, Pervasive, and Objectively Unreasonable that it Deprived Plaintiffs of Educational Opportunities
Turning to the first Davis element, the Court must determine whether the case facts support a finding of: (1) sexual harassment (2) that was so severe, pervasive, and objectively unreasonable (3) that it deprived Doe and Roe of educational opportunities at the Department's school system. See Stiles , 819 F.3d at 848. Although this test stands as single factor, the first Davis element touches on multiple issues. It should be no surprise, then, that many courts have found it helpful in their analysis to separate the element's considerations. Tumminello v. Father Ryan High Sch., Inc. , No. 3:15-cv-00684, 2015 WL 13215456, at *2 (M.D. Tenn. Dec. 7, 2015) (splitting sexual harassment element from the severity element), aff'd 678 F. App'x 281 (6th Cir. 2017) ; Roe ex rel. Callahan v. Gustine Unified Sch. Dist. , 678 F.Supp.2d 1008, 1025-29 (E.D. Cal. 2009) (analyzing severity and sexual harassment elements separately from the denial of benefits element). This Court will do the same here. First, it will be determined whether the alleged conduct constitutes sexual harassment, and next the Court will consider whether the facts support finding the harassment was "so severe, pervasive, and objectively unreasonable" as to constitute a denial of educational opportunities.
a. Sexual Harassment
Title IX does not cover every instance of student-on-student harassment that likely occurs on a regular basis in most schools. For instance, generalized bullying-motivated by personal animus, *558 opportunism, or social status-is not the sort of conduct proscribed by Title IX. Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist. , 647 F.3d 156, 165 (5th Cir. 2011). Congress has not turned everyday schoolhouse teasing into a potential federal suit in which every childish slight lays bare the school coffers. A Davis claim is only available to students who have been "harassed on the basis of his or her sex. " Tumminello v. Father Ryan High School, Inc. , 678 F. App'x 281, 284 (6th Cir. 2017) (emphasis added). As such, the Court must determine whether Doe and Roe experienced harassment "on the basis of" their sex. Id.
In the typical case, harassment can be "indisputably" identified as "sexual harassment" because it often "involve[s] male students harassing female students, ostensibly because of sexual desire." Hoffman v. Saginaw Pub. Sch. , No. 12-10354, 2012 WL 2450805, at *8 (E.D. Mich. June 27, 2012) ; see also Oncale v. Sundowner Offshore Servs., Inc. , 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) ("Courts and juries have found the inference of discrimination easy to draw in most male-female sexual harassment situations, because the challenged conduct typically involves explicit or implicit proposals of sexual activity; it is reasonable to assume those proposals would not have been made to someone of the same sex. The same chain of inference would be available to a plaintiff alleging same-sex harassment, if there were credible evidence that the harasser was homosexual." (Scalia, J., writing) ). Issues are not as straightforward when harassment involves harassers and victims that are the same sex and/or involves conduct that was not apparently motivated by sexual attraction, as is the case here. See id. To be sure, however, it has long been "settled law that 'same-sex sexual harassment is actionable under [T]itle IX.' " Carmichael v. Galbraith , 574 F. App'x 286, 290 (5th Cir. 2014) (quoting Sanches , 647 F.3d at 165 ); see also e.g. Mathis v. Wayne Cty. Bd. of Educ. , 496 F. App'x 513 (6th Cir. 2012) (finding as cognizable a Davis claim for same-sex sexual harassment). Further, "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." Oncale , 523 U.S. at 80, 118 S.Ct. 998.[1]
Doe and Roe experienced same-sex harassment that was not apparently "motivated by sexual desire."[2] Id. Such harassment could be "on the basis of sex" in a myriad of circumstances. Id. An obvious example is when classmates tease a student because he or she does not "conform to traditional gender stereotypes in an observable way." See Tumminello , 678 F. App'x at 285. Also, same-sex harassment is "on the basis of sex" if the harasser is *559 motivated by an animus toward the presence of others that are the same gender. See Oncale , 523 U.S. at 80, 118 S.Ct. 998 ("for example, [harassment is actionable under Title VII,] if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace"). In other contexts, however, courts have had a harder time determining whether same-sex harassment occurs "on the basis of" the victim's sex. For instance, courts have faced difficulty when confronted with cases in which a student was harassed due to their sexual orientation. Tumminello , 678 F. App'x at 286. The Sixth Circuit has held-albeit in an unpublished opinion-that such harassment is not "on the basis of sex" and thus not covered by Title IX. Id.
Courts have likewise struggled with cases similar to the present one, where hazing occurs in a sports or team setting. In such situations, it is not always obvious whether alleged hazing was motivated by the victim's sex. See e.g. Seamons v. Snow , 84 F.3d 1226 (10th Cir. 1996) (holding incidents of hazing provided no evidence "sex was used to contribute to a hostile [educational] environment"). Typically when presented with the issue, there is little objective evidence from which to infer the hazers' conduct was carried out "on the basis of sex." For example, there is often no "direct comparative evidence about how the alleged harasser treated members of both sexes" in a similar context (e.g. locker-room horseplay). Oncale , 523 U.S. at 81, 118 S.Ct. 998. Additionally, hazing, by its nature, is primarily motivated by team hierarchy, seniority, or class position (e.g. seniors hazing freshmen), not necessarily sex. To further complicate matters, the Supreme Court has cautioned courts and juries to not overreact and confuse "ordinary socializing," such as "male-on-male horseplay," for sexual discrimination. See id. These concerns and evidentiary issues have made it difficult to parse out the type of hazing that Title IX covers.
Here, Doe and Roe point to comments made by some of their hazers as evidence that their harassment occurred because of their sex-or to be more specific, presumably due to a perceived failure to live up to their harassers' ideal view of masculinity. For example, when the team's upperclassmen would beat up the freshman players in the team locker room, they would yell: "don't be a pussy," "take it like a man," and "this is going to make you a man." [Doc. 179 at 3]. However, those comments are hardly dispositive. Sanches , 647 F.3d at 165 ("The offensive behavior ... must still be based on sex, per the words of [T]itle IX, and 'not merely tinged with offensive sexual connotations.' " (quoting Frazier v. Fairhaven Sch. Comm. , 276 F.3d 52, 66 (1st Cir. 2002) ); see also Davis , 526 U.S. at 651-52, 119 S.Ct. 1661 (holding "damages" are not available for "name-calling ... even where these comments target differences in gender."); Diebold v. Hartford Pub. Sch. , No. 1:15-cv-529, 2017 WL 4512575, at *5 (W.D. Mich. May 25, 2017) (holding that harassment mixed with a gendered comment "fails to support the proposition that the harassment at issue in this case is 'on the basis of sex,' as required for liability under Title IX."); J.H. v. Sch. Town of Munster , 160 F.Supp.3d 1079, 1092-93 (N.D. Ind. 2016) (holding evidence that a victim was called derogatory, gendered names was not sufficient evidence to support Title IX claim); Roe ex rel. Callahan v. Gustine Unified Sch. Dist. , 678 F.Supp.2d 1008, 1027 (E.D. Cal. 2009) ("The use of gender-based or sexually loaded insults such as 'fag' or 'homo' can certainly be indicative of animus on the basis of gender, but the use of such terms without more is not necessarily sufficient *560 to establish gender discrimination."). Further, statements such as "take it like a man" and "this is going to make you a man" could reasonably be understood as regarding the victims' age, not merely their gender. Nonetheless, the comments, although not direct evidence that Doe and Roe's harassers were motivated by gender, are appropriately considered in the "constellation of surrounding circumstances" of alleged conduct. Davis , 526 U.S. at 631, 119 S.Ct. 1661 (quoting Oncale , 523 U.S. at 82, 118 S.Ct. 998 ). This is particularly true when the comments were made in context of the sexual assaults. [See Doc. 185-7 at 121].
Here, when determining whether the team's hazing can be construed as the type of harassment proscribed by Title IX, one does not have to look further than the sexual assaults sitting at the core of these lawsuits. Those assaults, which involved upperclassmen using pool cues to sodomize or simulate sodomy on freshman players, occurred near nightly at the Gatlinburg cabin during the trip. The Court finds these assaults create a factual inference that the team's hazing amounted to sexual harassment contemplated by Title IX, meaning it was carried out "on the basis of" Doe's, Roe's, and the other freshmen's sex. See e.g. Doe v. Rutherford Cty., Tenn. Bd. of Educ. , No. 3:13-cv-328, 2014 WL 4080163, at *10 (M.D. Tenn. Aug. 18, 2014). There has been some confusion in the Sixth Circuit regarding whether a Title IX plaintiff's alleged sexual assault factors into the analysis under the first Davis element. See Pahssen , 668 F.3d at 364 (explaining "whether [the court] should consider ... sexual assault ... under the first Davis element" presents an "ambiguity," but did not resolve the issue because the claim failed on other grounds). Other decisions have not been so uncertain. For example, shortly after Davis , the Sixth Circuit found "rape and sexual abuse[ ]" motivated by the attackers' sexual desire "obviously qualifies as .... sexual harassment." Soper v. Hoben , 195 F.3d 845, 855 (6th Cir. 1999) (emphasis added). Likewise, in an unpublished decision, issued shortly before the Pahssen court perceived an ambiguity in this context, a Sixth Circuit panel found that a locker room incident in which eighth grade boys forced their male basketball teammate "to the ground, pulled his pants down and anally penetrated him with a marker" could reasonably be considered by a jury as a "serious incident" of sexual harassment, and "not just horseplay gone awry." Mathis , 496 F. App'x at 516.
Considering sexual assaults under the first Davis element, as the Mathis court did, is a logical approach-although it is understandable why one could detect an ambiguity on this issue. Sexual assaults are by their definition "sexual," but it does not follow that those who carry out such attacks are always motivated by their victim's gender. That adds a wrinkle into the analysis, because Title IX is concerned with "discrimination in the form of ... sexual harassment," not necessarily harassment that is "sexual" in nature. Davis , 526 U.S. at 639, 119 S.Ct. 1661 (emphasis added); see also Oncale , 523 U.S. at 81, 118 S.Ct. 998 (holding the Title VII plaintiff alleging harassment "must always prove the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimina[tion] ... because of ... sex.' " (emphasis in original) ). To be sure, it is sensible to assume in the overwhelming majority of sexual assault cases, the victim's gender is a motivating factor for the attacker; this is indisputably the case when the attacker is driven by sexual desire. Likely because of this, the Office of Civil Rights (OCR), the executive agency tasked with enforcing Title IX, has taken this reasonable assumption *561 one step further and held, as a per se rule, that all acts of "sexual violence" against students-which the OCR defined as a nonconsensual "sexual acts," including "rape, sexual assault, sexual battery"-"are forms of sexual harassment covered by Title IX." See Dear Colleague Letter from Russlynn Ali, Assistant Secretary of Education for Civil Rights (Apr. 4, 2011) available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html. OCR's determination, although not controlling here, does have some persuasive value. See Christensen v. Harris Cty. , 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). However, while the Court agrees that most sexual assaults are motivated by the victim's gender, a Title IX legal conclusion in this context would only be beneficial if all sexual assaults are necessarily motivated by the victim's sex, and this does not appear to be true. This case provides evidence for that proposition, and its facts are hardly unique. It is an unfortunate reality that athletic hazing, despite not being typically motivated by sexual desire, can become sexually exploitive. See Susan P. Stuart, Warriors, Machismo, and Jockstraps: Sexually Exploitive Athletic Hazing and Title IX in the Public School Locker Room , 35 W. New Eng. L. Rev. 377, 384-87 (2013) (describing multiple incidents of team hazing that involved sodomizing victims with foreign objects). It is difficult to find with certainty that such sexual assaults in hazing are carried out "on the basis of sex." For instance, as is relevant here, although the upperclassmen sexually assaulted freshmen players, there is little direct evidence their actions were motivated by their victims' gender. It could be the case that, given the right circumstances, the attackers would have hazed female freshman players in a similar fashion. However, contemplating a harasser's motive inserts a difficult factual determination that must be grounded in common sense and social experience, and as a result the issue is not easily or helpfully reduced to formulaic legal conclusions. Instead, if a reasonable inference of discrimination can be drawn from the evidence, a fact finder should resolve the question. Id. In the context of sexual assaults in hazing, a jury could reasonably infer the attack was motivated by an undercurrent of social dynamics that has a basis in the victim's gender.
Sexually exploitative hazing in male athletics is based on the victim's gender if the acts have the intended goal of "diminish[ing]" the victim's "masculinity" or male identity. Stuart, supra , at 387. For instance, sexual assaults in hazing can have "the purpose of feminizing and homosexualizing recruits to establish and reaffirm their position at the bottom of the team's heteromasculine hierarchy." Id. (quoting Eric Anderson et al., Male Team Sport Hazing Initiations in a Culture of Decreasing Homohysteria , J. Adolescent Res., July 4, 2011, at 5, available at http://www.ericandersonphd.com/journal-articles.php). Indeed, when Doe was asked why he believed he was raped, it appeared that this was his understanding when he said: "[the attacker] ... tried to make me feel like less than a man, less than him." [Doc. 141 at 5].[3] As such, when faced with an incident of sexual assault in the context of hazing, it is not unreasonable for a jury to infer that the purpose of the attack has a basis in the victim's sex. See *562 Gustine , 678 F.Supp.2d at 1027 (involving a hazing incident in which a Title IX plaintiff was sodomized with an air pump) (holding "a reasonable jury could find the alleged" acts "were based upon [the victim's] sex").
Here, after considering the "constellation of surrounding circumstances" of the team hazing-including the sexual assaults, Doe's rape, and the gendered comments accompanying the freshman beatings-a reasonable jury could conclude Doe and Roe were indeed harassed, and further justifiably infer that their harassment occurred on the basis of their sex. Davis , 526 U.S. at 633, 119 S.Ct. 1661. Ultimately, the issue involves a material question of fact. As such, summary judgment-in either direction-would not be appropriate. Accordingly, on this issue, the Department's [Doc. 177] and Plaintiffs' [Doc. 178] Motions for Summary Judgment are DENIED .
b. Deprivation of Educational Benefits
Under Davis , damages are not available for all instances of sexual harassment. An aggrieved Davis plaintiff, instead, has an additional hurdle and must establish he or she suffered sexual harassment that was "so severe, pervasive, and objectively unreasonable ... that [it] undermine[d] and detract[ed] from the victims' educational experience, that the [student was] effectively denied equal access to an institution's resources and opportunities." Davis , 526 U.S. at 651, 119 S.Ct. 1661. The Court imposed this requirement to guard against the imposition of "sweeping liability." Id. at 652, 119 S.Ct. 1661. Students "may regularly interact in a manner that would be unacceptable among adults," but "damages are not available for simple acts." Id. at 651-52, 119 S.Ct. 1661 Rather, sexual harassment must be "sufficiently severe" to be actionable under Title IX. Id. at 650, 119 S.Ct. 1661. Further, circuit precedent limits evidence under this element to instances of the plaintiff's own personal harassment, meaning Davis plaintiffs cannot meet their burden by relying on the harassment of other students. Pahssen , 668 F.3d at 363.
In Doe's case, this element is undoubtedly met. After his rape, Doe needed lifesaving, emergency surgery to repair his perforated bladder and rectal wall. Thereafter, he was hospitalized for six days, including Christmas. [Doc. 178-2 at 131]. After his discharge, Doe was bed bound for one month; he faced a lengthy recovery, which included him not being able to eat or use the bathroom, and he had to re-learn how to walk. [Doc. 185 at 9]. Doe asserts he did not fully physically recover from his injuries until September 2016, and to this day still feels physical pains related to the rape. [Id. at 10]. Further, Doe never returned to OHS after his rape, likely due to embarrassment. [See Doc. 185-4 at 14 (Doe: "[I]f I would've returned back to Ooltewah, a lot of people already knew who I was, they would've wanted to know, you know, exactly want happened (in reference to the rape). So I [made the choice] to [go to] a different school."].
Doe's choice to transfer schools following his rape necessarily inserts a factual question regarding whether the deprivation was causally related to his harassment. See Gustine , 678 F.Supp.2d at 1028. However, even with that factual issue aside, it can be legally presumed when a plaintiff is hospitalized resulting from harassment arising out of a school operation, the student's harassers "undermine[d] and detract[ed]" from his or her "educational experience." Davis , 526 U.S. at 651, 119 S.Ct. 1661 ; see also Gustine , 678 F.Supp.2d at 1028 (holding hospitalization is demonstrable evidence of educational deprivation (citing *563 Murrell v. School Dist. No. 1, Denver, Colo. , 186 F.3d 1238, 1248-49 (10th Cir. 1999) ) ). Further, "severe" physical injuries that require hospitalization necessarily result in a student's exclusion from continued participation in an ongoing school operation. Id. For instance, Doe's rape injuries prevented access to OHS "resources and opportunities" in an objective, physical way. Id. Due to his hospitalization, he was unable to participate in the remainder of the holiday basketball tournament-or participate in basketball in any capacity for some time afterward, for that matter. It is beyond reasonable dispute that Doe's rape was a but-for cause of this deprivation. His attackers, therefore, empirically deprived him of the full benefit of extracurricular educational opportunities. As such, it can be concluded as a matter of law that Doe's rape was "severe" and "objectively offensive" harassment that deprived him of "institutional resources and opportunities" at OHS and "undermine[d] and detract[ed] from [his] educational experience." Davis , 526 U.S. at 651, 119 S.Ct. 1661 ; see also Vance v. Spencer Cty. Pub. Sch. Dist. , 231 F.3d 253, 259 (6th Cir. 2000) (holding in some instances a single incident of harassment "can satisfy a [Title IX claim"); Soper , 195 F.3d at 855 (holding rape "obviously qualified as severe, pervasive, and objectively offensive sexual harassment that could deprive [a student] of access to the educational opportunities provided by [a] school.").
Unlike Doe, Roe was never hospitalized as a result of his sexual assault. Similar to Doe, however, Roe transferred to another school following the Gatlinburg incident. [Doc. 185-6 at 11]. After his assault, Roe tried to attend OHS for a short time, and he even continued to compete on the school's varsity basketball team until the season was canceled as a result of the Gatlinburg incident. However, during this time the friends of Roe's attackers harassed Roe at school by "calling [him] names," telling him his sexual assault "wasn't that big of a deal," and at times threatening him. [Doc. 178-1 at 206]. Roe claimed this harassment made it difficult for him to continue attending OHS, so he decided to transfer to another school. [Id. ]. Roe's harassment by his attacker's friends was a form of secondary harassment that is hardly unique to this case. For example, in Doe v. East Haven Bd. of Educ. , a fourteen-year-old female student was allegedly raped, outside of school operations, by two male classmates. 200 F. App'x 46, 48 (2d Cir. 2006). After the allegations became public and the plaintiff returned to school, she was harassed for weeks by "other, primarily female, students," which included "verbal abuse" such as being called: " '[a] slut, a liar, a bitch, [and] a whore.' " Id.[4] Further, she would often "see her rapists at school." Id. Because of the name calling and the presence of her rapists, the plaintiff would skip classes and otherwise spend time at school in a private, secluded room, which the school had provided her. Id. The Second Circuit found based on those facts "a reasonable fact-finder could conclude that [the plaintiff] was subjected to a disparately hostile educational environment that deprived her of educational benefits and opportunities." Id. (emphasis added). The Court finds the East Haven court's analysis persuasive here. Based on these facts, a reasonable fact finder could conclude Roe's post-assault *564 harassment was: causally related to his sexual assault, deprived him of educational opportunities and resources at OHS, and caused him to transfer to another school. As such, the Department's Motion for Summary Judgment [Doc. 177] on this issue is DENIED . Further, because genuine issues of material fact surround Roe's alleged deprivation, the Court finds the Plaintiffs' Motion for Partial Summary Judgment [Doc. 178] on this issue should also be DENIED .
2. Actual Knowledge
To prove a claim under Davis , a plaintiff must establish the defendant school system had actual knowledge of the plaintiff's sexual harassment. This actual knowledge requirement is an essential element of a Davis claim. With Davis , it was not the Supreme Court's intent to broadly construe Title IX to hold schools vicariously liable for their students' actions, or create a federal educational negligence claim by making schools liable when it failed to act to prevent student harassment it "should have known " about. Davis , 526 U.S. at 642, 119 S.Ct. 1661 (emphasis in original); Winzer v. Sch. Dist. for City of Pontiac , 105 F. App'x 679, 682 (6th Cir. 2004) (holding the Sixth Circuit has declined to adopt a "constructive-knowledge standard" under Title IX). Rather, liability under Davis derives from a school's own conduct, particularly a decision to not act in fulfilling Title IX duties to prevent severe forms of student-on-student sexual harassment, and that duty is triggered upon actual notice of such harassment. Id.
Applying the actual notice standard under Davis is ultimately a matter of who knew what and when. This presents even further questions, however. Starting with the who, obviously school systems are not natural persons capable of personal knowledge. As such, if a school district can be said to have "actual knowledge" of harassment, it follows that it is imputed from one of its agent's knowledge. But what sort of agent is capable of imputing notice to the Department in this context? Is the knowledge of a school administrator required? Or is a teacher's knowledge sufficient? Is the knowledge of a non-teaching staff member, such as a nurse, janitor, or cafeteria worker enough? The dissenters in Davis criticized the Court for not addressing this question. Id. ("The majority's ... [actual knowledge] standard begs the question: known to whom?" (Kennedy, J., dissenting) ).
For reasons that will be discussed infra , the Court finds the knowledge of Coach Montgomery is essential to the viability of Doe and Roe's claims. At a minimum, a person capable of imputing knowledge to a school system-what the Gebser court referred to as an "appropriate person," 524 U.S. at 290, 118 S.Ct. 1989 -must have been entrusted with the school's "disciplinary authority" over students. See Davis , 526 U.S. at 647, 119 S.Ct. 1661. The crux of the actual knowledge element in this case, then, depends on whether Coach Montgomery was an "appropriate person." In Gebser suits, which involve Title IX claims for teacher-on-student sexual harassment, an "appropriate person" capable of imputing knowledge is defined as "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures." 524 U.S. at 290, 118 S.Ct. 1989. It appears the same reasoning applies in a Davis case. See Tumminello , 678 F. App'x at 286 (applying Gebser 's appropriate person standard in a Davis case); but see Stiles , 819 F.3d at 848 ("Actual knowledge requires only that a single school administrator with authority to take corrective action had actual knowledge of the sexual harassment." (emphasis added) (citing Gebser ) ).[5] Extending *565 Gebser 's rule here, a school agent with the authority to discipline students and prevent and correct known harassment is an "appropriate person" whose knowledge can be imputed to the Department. However, some courts do not agree with that straightforward rationale. For example, the Eleventh Circuit has added an additional condition to this test and held that an "appropriate person" must also be one that is "high enough up the chain-of-command that his acts constitute an official decision by the school district itself not to remedy the misconduct." Floyd v. Waiters , 171 F.3d 1264, 1264 (11th Cir. 1999) (involving Gebser claim). When applying that test in the Davis context, the Eleventh Circuit has found a teacher's aide is not an appropriate person capable of imputing knowledge to a school. Hill v. Cundiff , 797 F.3d 948, 971 (11th Cir. 2015). As to "whether notice to a teacher constitutes actual knowledge on part of a school board," the Eleventh Circuit has found it to be an "open question." Hawkins v. Sarasota Cty. Sch. Bd. , 322 F.3d 1279, 1286 (11th Cir. 2003). By contrast, the OCR has applied a more liberal standard, and has held an appropriate person includes not only school agents with the authority to discipline students but also any employee that "has the duty to report" harassment to an "appropriate school official." Request for Comment, 65 Fed. Reg. 66092-01, 66102 (Nov. 2, 2000). As examples, the OCR listed "campus security, bus driver ... or staff in the office of student affairs." Id.
Here, Coach Montgomery was not only the basketball team's head coach, he was also a teacher at OHS. [Doc. 185-11 at 10]. However, even then, his role on the school trip went beyond his regular duties. The Department, acting outside of its regular scope, committed itself to the supervision of students on a multiple day trip, including an over two-and-a-half hour journey and overnight stays. In this undertaking to see to the welfare of the players on a days-long trip, the Department vested the responsibility chiefly in one man, Montgomery, although Assistant Coach Williams helped him supervise the team. [Doc. 185 at 5]. There Montgomery was not simply acting as an educator or basketball coach, but as a caretaker and guardian entrusted with the players' well-being, including providing meals, shelter, transportation, and even washing their clothes [see Doc. 185 at 7]. Far from school campus and outside of normal school operating hours, Montgomery was not merely a cog in a larger educational bureaucracy, expected to push harassment problems up the chain of command. Instead, the Department had at least implicitly commissioned him with its full authority to take appropriate disciplinary actions during the trip. Further, in Gatlinburg, he had near autocratic power to dictate the conduct in the cabin, including, for instance, the ability to assign where players slept and what time they went to bed. While acting in this role, Montgomery unquestionably had the authority to address, correct, and prevent student-on-student sexual harassment. As such, the Court finds Montgomery was an "appropriate person" while in his capacity as a supervisor and his knowledge can be imputed to the Department.
Because Montgomery was an "appropriate person" under the facts, it must next be determined what he knew prior to Doe and Roe's sexual attacks, and whether it constitutes actual knowledge. "It is difficult to define what kind of notice is sufficient"
*566 under Title IX. Gustine , 678 F.Supp.2d at 1029 (quoting Tesoriero v. Syosset Cent. Sch. Dist. , 382 F.Supp.2d 387, 397 (E.D.N.Y. 2005) ). Plaintiffs point to two sources of information that should have provided Montgomery with actual notice of "severe, pervasive, and objectively unreasonable" sexual harassment occurring on the basketball team. [Doc. 192 at 6]. First, Plaintiffs claim Montgomery knew of the freshman rackings (the generalized, presumably non-sexual hazing that occurred prior to the Gatlinburg trip), and that the knowledge provided him actual notice of the later severe sexual harassment. [Id. ]. Secondly, Plaintiffs point to Doe and Roe's attackers' disciplinary history and claim it sufficiently provided actual notice of their propensity to engage in sexual harassment. [Id. ]. The Court finds neither argument is persuasive. Each will be discussed in turn.
Plaintiffs present multiple examples of Montgomery's knowledge of the rackings, all of which were conclusions reached in an independent report commissioned by the school. [Docs. 183 at 9, 185 at 4, & 192 at 8 (citing the independent report) ]. First, Montgomery's office was adjacent to the boys' locker room, where the rackings often occurred. Plaintiffs claim "it [is] 'unlikely that he would not hear the players banging around' " next door. [Doc. 185 at 4 (quoting the independent report) ]. Two months prior to the Gatlinburg incidents, a player's mother complained that her son had been hazed. [Id. at 2]. Further, Montgomery encountered physical evidence of roughhousing, such as a broken television that Plaintiffs allege was collateral damage in a racking skirmish. [Id. at 4]. It is also asserted that Montgomery, on several occasions, walked into the locker room to find the players inside with the lights turned off (supposedly the lights were off in relation to freshman beatings), and Montgomery would often say "stop the horseplay" and turn on the lights. [Id. at 4-5]. Finally, Plaintiffs proffer the basketball players discussed the rackings in front of Montgomery, and he would occasionally punish upperclassmen for known hazing. [Id. ]. For example, he made one player run "suicides," supposedly as punishment for participating in rackings. [Id. ]. It is not apparent how this scatter shot of speculative and seemingly unrelated evidence amounts to an "inevitabl[e] ... conclusion" that Montgomery had pre-assault, actual knowledge of "severe" sexual harassment. [Doc. 183 at 9]. But even if he were aware, Plaintiffs face another obstacle.
The crux of Plaintiffs' argument depends on whether lesser forms of non-sexual hazing can provide notice for serious forms of sexual harassment. To support the proposition, Plaintiffs point to Mathis v. Wayne Cty. Bd. of Educ. , 782 F.Supp.2d 542 (M.D. Tenn. 2011). [Doc. 192 at 7]. The Mathis case, discussed supra , involved an attack similar to this case in which players on an eighth grade boys' basketball team held down a teammate and anally penetrated him with a magic marker. Mathis , 782 F.Supp.2d at 546. On the issue of actual knowledge prior to the marker incident, Judge Trauger held an "institution" can be held "liable" when it "possessed enough knowledge of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based." Id. at 550 (emphasis added) (quoting Staehling v. Metro. Gov't of Nashville and Davidson Cty. , No. 3:07-0797, 2008 WL 4279839, at *10 (M.D. Tenn. Sept. 12, 2008) ). The prior "kind of harassment" the court was referring to was a separate sexual assault nearly identical to the marker incident underlying that case, with a major difference being the instrumentality of penetration in the first assault was a pencil *567 rather than a marker. Id. There was evidence the coach had been aware of the pencil incident prior to the marker incident. Id. When determining whether the knowledge of the pencil incident, combined with another event sexual in nature and other "horseplay," was sufficient to trigger duties under Title IX, the Mathis court held a reasonable jury could conclude the coach had "enough" knowledge to spur him into action to prevent further sexual harassment. Id. at 551.[6] Relying on this case, Plaintiffs claim Montgomery's alleged knowledge of the rackings supports a legal conclusion that the Department had actual knowledge of sexual harassment on the varsity boys basketball program prior to Doe and Roe's assaults. [Doc. 192 at 6-8]. However, this assertion is wrong for two reasons. First, there is no evidence from which a reasonable jury must conclude Montgomery was fully aware of the rackings or their alleged severity. And secondly, even if he were aware, knowledge of the non-sexual hazing does not constitute actual knowledge of the "kind of harassment" underlying this case: the sexual assaults.
Prior to their sexual attacks, Students A, B, and C had past disciplinary problems, which Plaintiffs claim put the Department on notice of their potential for sexual harassment. Under Davis , actual knowledge can be derived from a harasser's past harassment. These past acts may provide a school notice if the conduct demonstrates a pattern of and propensity for sexual harassment, even if prior harassing was not directed toward the plaintiff specifically. See Gustine , 678 F.Supp.2d at 1030 (collecting cases); see also Delgado v. Stegall , 367 F.3d 668, 672 (7th Cir. 2004) ("[I]n Davis the Court required knowledge only of 'acts of sexual harassment ' by the [harasser]" (emphasis added) ); Lopez v. Metro. Gov't , 646 F.Supp.2d 891, 916 (M.D. Tenn. 2009) (collecting cases) (" '[T]he Davis court did not limit Title IX liability to a federal education funding recipient's knowledge of, and deliberate indifference to, the alleged harassment of a particular individual , but instead contemplated that Title IX claims could be based on the recipient's knowledge of, and deliberate indifference to, a particular harasser's conduct in general.' " (quoting J.K. v. Arizona Bd. of Regents , No. CV06-916-PHX-MHM, 2008 WL 4446712, at *14 (D. Ariz. 2008) ). Plaintiffs point to a whole host of student behavior it claims put the Department on notice for the potential of sexual harassment at OHS. For instance, Plaintiffs broadly focus on school wide, generalized bullying that often occurred at OHS, what they claim was a "bullying epidemic." [Doc. 179 at 7]. However, knowledge of general bullying among various students-which has likely occurred to some degree in every school since there were schools-falls far short of *568 providing actual notice of on-going student-on-student sexual harassment or its potential. Outside of generalized bullying, Plaintiffs do point to a few prior acts specific to Doe and Roe's attackers. For example, it is asserted Student A had previously been disciplined for bullying and "rough housing." [Doc. 185 at 6]. Likewise, Student B "had been officially reprimanded for engaging in sexually inappropriate behavior, 'horseplay,' and misconduct that warranted suspending him for three OHS basketball games." [Id. ] And Student C "was formally disciplined by the school system for fighting and possessing an adult video on his phone." [Id. ]. Despite Plaintiffs' reliance on these disciplinary events, they are not prior acts of sexual harassment sufficient to put the Department on notice. Obviously, the fighting, "horseplay," "rough housing," and bullying say little about a person's propensity for sexual harassment and, as such, cannot provide actual knowledge of conduct covered by Title IX. Further, the other incidents, the events cited as being "sexual" in nature, are likewise insufficient because Plaintiffs fail to demonstrate how the conduct is associated with sexual harassment, and if the information was demonstrably linked to covered conduct, it is otherwise stale. For instance, Student B's prior "sexually inappropriate behavior" refers to a 2011 incident, four years prior to the Gatlinburg assaults, in which a then fourteen-year-old Student B and two other boys told jokes with phallic innuendos. [Doc. 185-16 at 3]. This event hardly gave the Department notice that Student B was a potential sexual harasser. Further, a pornographic video was found on Student C's cellphone in 2013, two years prior to the Gatlinburg attacks. Nevertheless, Student C was not caught watching the video while at school or showing it to classmates, which could possibly demonstrate a propensity for a troubling sexual perversion. Rather, school officials were investigating Student C's cellphone after he used it to record a school fight when they stumbled on to the adult video on his phone. [Doc. 185-17 at 4]. These events do not support a conclusion that the Department had actual knowledge that Doe and Roe's attackers were sexual assault risks, and as such, they fail to support Plaintiffs burden. Although this and the non-sexual hazing are insufficient, other evidence in the record can suffice.
The facts surrounding the Gatlinburg incidents support an inference of actual knowledge. A rational fact finder could conclude from the evidence that Coach Montgomery knew about team sexual assaults prior to Doe and Roe's attacks, and therefore had actual knowledge. As an initial matter, it appears upperclassmen sexually assaulting freshman with pool cues was not a new or novel practice for the team. For example, prior to the sexual assaults, Student A told Doe that in years past "upper classmen had ... 'used the pool sticks on him,' " and Doe overheard the upperclassmen joking about using the cues. [Doc. 179 at 4]. Depending on whether Montgomery was present during these statements, they may be admissible for the non-hearsay purpose of demonstrating Montgomery's knowledge. See In re Morrison , 555 F.3d 473, 483 (5th Cir. 2009). Further, at the cabin, Montgomery claimed the walls were thin and that he was able to hear the players downstairs, including even their conversations. [Doc. 185 at 8]. On December 20th, Students A, B, and C held down their first victim, Student F, and used a pool cue to simulate sodomy on him. [Doc. 185 at 7]. Throughout this ordeal, Student F screamed. [Id. ]. If Montgomery was able to hear the players' conversations while upstairs, it follows he should have been able to hear their screams and scuffles as well. After Student *569 F's attack, Students A and B wrestled Roe to the ground and again simulated sodomy with a pool cue while yelling "take it like a man" and "don't be a pussy," and like Student F, Roe screamed. [Id. ]. The next day, Student H was similarly attacked and also screamed. [Id. ]. During this attack, Doe was sitting on the cabin stairs, near the upstairs area where Montgomery was at the time, and Doe could clearly hear Student H's screams. [Id. at 8]. Likewise, on the following day, Roe was standing near the top of the stairs with Assistant Coach Williams just prior to Doe's rape. [Id. at 8]. From that vantage point, Roe could see Students A, B, and C carrying a pool cue and pushing Doe into a room. [Id. ] He told Assistant Coach Williams what he saw. [Id. ]. Williams did not intervene, Doe was raped, and Roe could hear his screams from where he was standing. [Id. at 8]. In sum, the attacks occurred daily. During the attacks, the attackers verbally badgered their victims, who screamed and attempted to fight off their assailants. These surely were not subtle events. When considered in the context of Montgomery's claim that he could hear the players while upstairs, a reasonable fact finder could deduce Montgomery had actual knowledge of the sexual assaults at some point prior to Doe and Roe's attack. As such, the Department's Motion for Summary Judgment [Doc. 177] will be DENIED on this issue. On the other hand, the Court finds this is a close factual question; reasonable minds could reach different conclusions based on the evidence. In these situations, summary judgment is not appropriate in either direction. Accordingly, Plaintiffs' Motion for Partial Summary Judgment is likewise DENIED .
3. Deliberate Indifference
Title IX imposes liability on federal education funding recipients if it "subject[s]" persons to discrimination "on the basis of sex." 20 U.S.C. § 1681. Because liability only results when the recipient can be said to have "subjected" "persons" to sexual discrimination, there must action-or inaction in the face of a duty-on the part of the funding recipient, and further, this conduct must have played some causal role in the victim's discrimination. In the Davis context, liability extends when a school is deliberately indifferent to student-on-student sexual harassment. Davis , 526 U.S. at 648, 119 S.Ct. 1661. A school is deliberately indifferent to student-on-student sexual harassment "only " when its "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." Davis , 526 U.S. at 648, 119 S.Ct. 1661 (emphasis added). It is "clearly unreasonable," for example, for a school to make "no effort whatsoever either to investigate or put an end to [known] harassment." Id. at 654, 119 S.Ct. 1661. Further, to satisfy the causation requirement under Title IX, "the deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." Vance , 231 F.3d at 260 (quoting Davis , 526 U.S. at 645, 119 S.Ct. 1661 ).
When a case is based on a sexual attack, liability for deliberate indifference can "flow from two ... time periods." Lopez , 646 F.Supp.2d at 917-18. Title IX liability can arise from either:
(a) when a school exhibits deliberate indifference before a harassing attack on a student ... in a way that makes the student more vulnerable to the attack itself; or (b) when a school exhibits deliberate indifference after an attack, that causes a student to endure additional harassment.
Id. Plaintiffs assert there was both pre-assault and post-assault deliberate indifference *570 here. These assertions will be examined in turn.
a. Pre-Assault Deliberate Indifference
The issue of pre-assault deliberate indifference in this case turns on the factual question regarding whether Coach Montgomery had actual knowledge of the sexual assaults prior to each of the Plaintiffs' particular assaults. If there was no actual knowledge, then Montgomery, and the Department by proxy, cannot be said to have been deliberately indifferent to what was not known. However, assuming a fact finder does conclude Montgomery had knowledge, he was certainly deliberately indifferent. Under those circumstances, his conduct is the model example of "clearly unreasonable" conduct, because he made "no effort whatsoever either to investigate or put an end to the harassment." Davis , 526 U.S. at 654, 119 S.Ct. 1661. Further, if true, this clearly unreasonable conduct left Doe and Roe vulnerable to sexual assault and is causally related to their attacks.
b. Post-Assault Deliberate Indifference
The Roe Plaintiffs also claim the school was deliberately indifferent following Roe's assault. [Doc. 183 at 12]. It is alleged that officials did not notify Roe's parents about his assault until he was on his way home, that the Department never offered "any explanation, comfort, or counseling," and Principal Jarvis, in particular, never reached out to Roe's family or recognized him as a victim. [Id. at 12-13].
Before delving into Roe's assertions, it is helpful to first explain what deliberate indifference is not. First, it is not a negligence standard. See Doe v. Claiborne Cty., Tenn. , 103 F.3d 495, 508 (6th Cir. 1996). Deliberate indifference "does not mean a collection of sloppy, or even reckless, oversights." Id. ; see also Doe on Behalf of Doe v. Dallas Indep. Sch. Dist. , 153 F.3d 211, 219 (5th Cir. 1998) ("Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference.") It "does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment." Vance , 231 F.3d at 260 (quoting Davis , 526 U.S. at 648, 119 S.Ct. 1661 ). The standard is not an open invitation for courts, which are often unacquainted with the realities of and constraints on school discipline, to "second-guess[ ]" school actions with the benefit of hindsight. Davis , 526 U.S. at 648, 119 S.Ct. 1661. Further, it is important to keep in mind that Title IX does not mandate "particular disciplinary action[s]," and the law does not entitle victims to a "right to make particular remedial demands." Id. Instead, Title IX simply requires that schools not act clearly unreasonably toward known student-on-student sexual harassment. See also Patterson v. Hudson Area Sch. , 551 F.3d 438, 451-52, 456 (6th Cir. 2009) (Vinson, J., dissenting).
The Department did not act with deliberate indifference following the sexual assaults. After Doe's rape, the assailants, Students A, B, and C, were separated from the other players, they were then taken back to Ooltewah as soon as was practical, later all three were removed from the team, and ultimately all were suspended from OHS. [Doc. 177-1 at 22]. As a result, Doe and Roe and the assailants never came into contact during school operations ever again. [Id. at 23]. The Department hired an attorney, Courtney Bullard, to conduct an investigation into the Gatlinburg incidents on March 22, 2016, less than three months after the event. [Doc. 182-11 at 1]. These actions are not "clearly unreasonable," and as such, the Department was not deliberately indifferent following the sexual attacks. See Davis , 526 U.S. at 649, 119 S.Ct. 1661 ("[T]here is no *571 reason courts ... could not identify a response as not 'clearly unreasonable' as a matter of law."). On the other hand, the Court does find it troubling that after Doe's attack Coach Montgomery allegedly told Doe, Roe, and another freshman, who had been assaulted, to keep the assaults "on the low" and to not "let this get out." [Doc. 185 at 8]. If true, the statements are clearly unreasonable, but Plaintiffs do not allege any further harassment arising from these statements. So, Title IX liability does not flow from the actions standing alone. Likewise, although perhaps Principal Jarvis should have contacted the affected families personally following the Gatlinburg incidents, Title IX does not impose financial liability on school for the moral blunders or social faux pas committed by its administrators. Accordingly, Principal Jarvis' failure to be conciliatory following the attacks does not constitute deliberate indifference as defined by Title IX.
To be clear, Roe did experience harassment following his sexual assault, see supra part III.A.1.b, but there is no evidence that he reported this to school officials or that the school otherwise had actual notice of his post-assault harassment. As such, the harassment cannot support a post-assault deliberate indifference claim. The harassment is, however, causally related to his sexual assault and is more properly characterized as damages resulting from the Department's pre-assault deliberate indifference, not evidence of post-assault indifference.
Having found the Department did not act with deliberate indifference following the sexual assaults, Plaintiffs' Motion for Partial Summary Judgment [Doc. 178] will be DENIED . Further, because the Department was not deliberately indifferent following the assaults, its Motion for Summary Judgment [Doc. 177] is GRANTED in part , in respect to post-assault deliberate indifference allegations. However, with respect to the pre-assault deliberate indifference, because genuine issues of material fact remain, the Department's Motion for Summary for Judgment is DENIED on that issue.
B. Section 1983 Claims
Plaintiffs allege Doe's and Roe's constitutional rights were violated and assert claims under 42 U.S.C. § 1983 (" § 1983") for relief against all Defendants on various grounds. In particular, they claim the Individual Defendants were deliberately indifferent to known sexual harassment and that Defendants failed to protect Doe and Roe in violation of their substantive due process rights. Additionally, it is asserted the Department failed to adequately train its staff and that this failure resulted in constitutional injuries to Doe and Roe.
1. Individual Defendants and Marsha Drake
Plaintiffs claim the events giving rise to this action violated their constitutional rights. Doe's and Roe's injuries directly resulted from sexual attacks committed by their teammates. Under 42 U.S.C. § 1983, only state actors can violate the Constitution, and the actions of private persons do not support claims for constitutional deprivations, generally speaking. This creates difficulty for plaintiffs asserting constitutional violations arising out of peer harassment, like in this case. As a general rule, students are not state actors. Mathis , 782 F.Supp.2d at 551. There are, however, caveats to the state action rule. Plaintiffs claim two are relevant here. First, the Equal Protection Clause supports claims arising from peer harassment under certain circumstances. Stiles , 819 F.3d at 851. Similarly, a claim against state officials for injuries caused by private actors can lie under the "substantive" component of the Due Process Clause, although those grounds are limited.
*572 DeShaney v. Winnebago Cty. Dep't of Soc. Servs. , 489 U.S. 189, 195, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).
Claims for unconstitutional gender discrimination in schools can be supported by § 1983. Fitzgerald v. Barnstable Sch. Comm. , 555 U.S. 246, 256, 129 S.Ct. 788, 172 L.Ed.2d 582 (2009). Under § 1983, "a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under color of state law." Doe v. Miami Univ. , 882 F.3d 579, 595 (6th Cir. 2018). Further, a plaintiff has to overcome another obstacle, the defendant's qualified immunity. Dominguez v. Cor. Med. Servs. , 555 F.3d 543, 549 (6th Cir. 2009). To do so, the plaintiff must show: (1) the defendant's act violated a clearly established right that a reasonable person would have known of at the time of the incident, and (2) evidence that shows what happened "was objectively unreasonable in light of the clearly established constitutional right." Andrews v. Hickman Cty. Tenn. , 700 F.3d 845, 853 (6th Cir. 2012). If a plaintiff fails to demonstrate a constitutional violation or overcome the defendant's qualified immunity, the claim fails. Pearson v. Callahan , 555 U.S. 223, 237, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). In analyzing these issues, district courts are accorded discretion in choosing which of these necessary elements it analyzes first. Id.
Under § 1983, a government official is only "liable for his or her own misconduct." Marcilis v. Township of Redford , 693 F.3d 589, 596 (6th Cir. 2012). "A defendant cannot be held liable under section 1983 on a respondeat superior or vicarious liability basis." Street v. Corr. Corp. of Am. , 102 F.3d 810, 818 (6th Cir. 1996). Consistent with this, a plaintiff must point to facts "that demonstrate what each defendant did to violate the asserted constitutional right." Heyne v. Metro. Nashville Pub. Sch. , 655 F.3d 556, 565 (6th Cir. 2011) (emphasis in original). Plaintiffs assert § 1983 claims against four individuals: Montgomery, Assistant Principal/Athletic Director Jess Naydley ("Naydley"), Principal James Jarvis ("Jarvis"), and Roe asserts a claim against Marsha Drake ("Drake"). Each will be examined in turn.
2. Coach Montgomery
Plaintiffs assert Montgomery violated Doe's and Roe's constitutional right to equal protection of the law and due process of the law.
a. Equal Protection
The Plaintiffs allege Montgomery violated Doe's and Roe's constitutional right to equal protection under the law. The Equal Protection Clause of the Fourteenth Amendment holds, in relevant part, that: "[n]o state shall ... "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The circuit has settled on how those equal protection claims should proceed in student-on-student harassment cases.
The Sixth Circuit recognizes two methods of proving an equal protection violation based on a school official's response to peer harassment: (1) disparate treatment of one class of students who complain about bullying as compared to other classes of students, see Soper v. Hoben , 195 F.3d 845, 852 (6th Cir.1999), and (2) deliberate indifference to discriminatory peer harassment, see Shively v. Green Local Sch. Dist. Bd. of Educ. , 579 Fed.Appx. 348, 356-57 (6th Cir.2014)...
Stiles , 819 F.3d at 851-52.
i. Disparate Treatment Claim
Plaintiffs are proceeding on both grounds mentioned. Under the first *573 of those, a disparate treatment claim, a plaintiff must show the state actor enforced policies in a way that had a disparate effect regarding a suspect class, such as gender. Further, the plaintiffs must show that the disparate impact was motivated by the state actor's discriminatory intent. Soper , 195 F.3d at 852 ("the [plaintiffs] must establish that the [school] treated the complaints [regarding sexual harassment] differently because of, not merely in spite of, the harmful [disparate] effect that such treatment would have."); see also Washington v. Davis , 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) ; Shively v. Green Local Sch. Dist. Bd. of Educ. , 579 F. App'x 348, 357 (6th Cir. 2014) ("[P]laintiffs must show either that the defendants intentionally discriminated or acted with deliberate indifference."). Plaintiffs assert "OHS went to great measures to address bullying of girls at the school," but "[n]o such measures were taken with respect to violence and harassment on the boys' varsity basketball team." [Doc. 184 at 5]. However, this is insufficient evidence for a disparate treatment claim for two reasons. First, the allegation is not particular to any defendant in this case, so it has little value in evaluating a § 1983 claim. Further, the assertion is insufficient standing alone because Plaintiffs have not proffered evidence showing that the disparate treatment was motivated by discriminatory intent. See Soper , 195 F.3d at 852. In sum, Plaintiffs' disparate treatment claims are unsupported, and there is no genuine issue for trial on that issue.
ii. Deliberate Indifference
As it relates to Montgomery, the equal protection allegations are more appropriately applied as a deliberate indifference claim. To make out a claim for deliberate indifference under the Equal Protection Clause, a plaintiff has to first demonstrate "he was subjected to discriminatory peer harassment" based on his status in a suspect class. Id. at 852 (citing Williams v. Port Huron Sch. Dist. , 455 F. App'x 612, 620 (6th Cir. 2012) ). Second, the plaintiff must demonstrate the "school official[ ] responded to the discriminatory peer harassment with deliberate indifference." Id. Plaintiffs correctly point out that the standard for deliberate indifference under equal protection is "substantially the same" as it is under Title IX. Id. That is, the official responded to known discriminatory harassment "in a manner clearly unreasonable in light of known circumstances." Id.
Because equal protection's version of deliberate indifference is the same as it was discussed supra under Title IX, the analysis does not change here. Plaintiffs assert their harassment was gender-based. [Doc. 184 at 4]. As stated earlier, a jury could reasonably infer Doe's and Roe's sexual assaults were a form of gender-based harassment. See Shively , 579 F. App'x at 356 (analyzing equal protection deliberate indifference claim for gender and religious discrimination). Likewise, if a jury were to draw the permissible inference that Montgomery had actual knowledge of the assaults, his actions were clearly unreasonable. Accordingly, a reasonable fact-finder in this case could find Montgomery was deliberately indifferent to Doe's and Roe's gender-based harassment in violation of their rights to equal protection. However, that is not the end of the analysis.
If a constitutional violation is established, the plaintiff must overcome the defendant's qualified immunity if raised. Montgomery has raised the defense here. [Docs. 184 & 186 at 20-22]. "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects *574 'all but the plainly incompetent or those who knowingly violate the law.' " Ashcroft v. Al-Kidd , 563 U.S. 731, 743, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011). To overcome qualified immunity, the plaintiff must demonstrate the right allegedly violated was "clearly established" at the time of the violation. Pearson , 555 U.S. at 236, 129 S.Ct. 808. "For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right." Holzemer v. City of Memphis , 621 F.3d 512, 527 (6th Cir. 2010). It is important to note, however, that "clearly established law should not be defined 'at a high level of generality.' " White v. Pauly , --- U.S. ----, 137 S.Ct. 548, 552, 196 L.Ed.2d 463 (2017). Instead, the right "must be 'particularized to the facts of the case.' " Id. "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers, but in the light of pre-existing law the unlawfulness must be apparent." Id. "[A] case on point" is not a requirement, but "existing precedent must have placed the statutory or constitutional question beyond debate." Mullenix v. Luna , --- U.S. ----, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015). Indication that a right is clearly established can be in the form of a case with "controlling authority or a robust consensus of cases of persuasive authority." Latits v. Phillips , 878 F.3d 541, 552 (6th Cir. 2017) (emphasis added).
To overcome Montgomery's qualified immunity, Plaintiffs cite an unpublished Sixth Circuit opinion, Shively , for its proposition that "the equal protection right to be free from student-on-student discrimination is well-established." 579 F. App'x at 358. However, Plaintiffs make the common mistake of reading Shively 's qualified immunity ruling too broadly. The Shively panel found school administrators "were not entitled to qualified immunity" when they allowed "unregulated [student-on-student] religious and gender-based persecution that spanned a four-year period." Id. By contrast, the alleged gender based harassment here lasted at most four days, not four years. See Doe v. Forest Hills Sch. Dist. , No. 1:13-cv-428, 2015 WL 9906260, at *14 (W.D. Mich. Mar. 31, 2015) (distinguishing Shively 's qualified immunity holding as involving deliberate indifference over a long duration). Shively is distinguishable on other grounds as well. The defendants in that case were deliberately indifferent, "[d]espite being told repeatedly about" the harassed student's religious and gender-based harassment. Id. at 351. (quoting the plaintiffs' brief). Plaintiffs concede here no one reported the sexual assaults or the gender based harassment to Montgomery. Given this, it might not have been "sufficiently clear" to a government agent at the time whether inaction to known but unreported harassment constitutes deliberate indifference of a constitutional magnitude. Under these circumstances, Montgomery is entitled to the protections of qualified immunity, and the deliberate indifference claim against him is due to be dismissed.
b. Substantive Due Process
The Fourteenth Amendment Due Process Clause holds that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Plaintiffs assert Montgomery violated Doe's and Roe's due process rights by not intervening to prevent their sexual assaults at the hands of their teammates. "But nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security."
*575 DeShaney v. Winnebago Cty. Dep't of Soc. Servs. , 489 U.S. 189, 195, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). As a result, "generally" the Due Process Clause "confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests ..." Id. at 196, 109 S.Ct. 998. On the other hand, as with any general rule, there are exceptions. The "substantive component" of due process imposes duty on the government and its agents to protect individuals in carefully limited circumstances. The Court will consider two relevant exceptions to the general rule here.
i. Special Relationship
First, the state is obligated to protect an individual against harm by private actors "where a 'special relationship' exists between the state and the private individual." Kallstrom v. City of Columbus , 136 F.3d 1055, 1066 (6th Cir. 1998). The quintessential example of a "special relationship" between a government and a person is when the government obtains custody over the person. See id. Minor students in public schools are in some sense committed to the state's custody. However, not every instance of government custody will constitute a special relationship. The relationship is a question of degree and arises "from the limitation which [the state] has imposed on [the individual's] freedom to act on his own behalf," "not from the State's knowledge the individual's predicament or from [the state's] expression of intent to help him." DeShaney , 489 U.S. at 200, 109 S.Ct. 998.
In this context, "the Sixth Circuit has consistently rejected the existence of a special relationship between school officials and students based on compulsory attendance laws or the school's knowledge of a student's vulnerability." Stiles , 819 F.3d at 854. Nonetheless, it could be argued Montgomery was not acting as merely a "school official" in the typical school setting, but rather, due to his role as a supervising chaperone on an overnight school trip, he was acting as the students' care taker (e.g. he was expected to provide them with: "food, clothing, shelter, medical care, and reasonable safety"). Deshaney , 489 U.S. at 200, 109 S.Ct. 998 ; but see Lee v. Pine Bluff Sch. Dist. , 472 F.3d 1026, 1031 (8th Cir. 2007) (holding band director had no special relationship duty to provide medical care to student on school trip because the student voluntarily chose to attend the trip). Putting those shrewd arguments to the side, the Court finds the answer is irrelevant in resolving the claims at hand; qualified immunity bars recovery in any event. Pearson , 555 U.S. at 237, 129 S.Ct. 808 (holding courts are permitted to resolve a claim under qualified immunity without reaching the claim's underlying merits). Given the Sixth Circuit's consistent rejection of special relationships in the educational setting, the contours of special relationships in this context are not "sufficiently clear" to have put Montgomery on notice. Holzemer , 621 F.3d at 527. Further, the Plaintiffs have not persuasively argued why Montgomery is not entitled to qualified immunity under this theory. As such, they have failed to meet their burden of overcoming Montgomery's qualified immunity, and the special relationship claims will be dismissed.
ii. State-Created-Danger
The next circumstance that can give rise to a governmental due process obligation to protect a person is known as the "state-created-danger" theory of liability. Kallstrom , 136 F.3d at 1066. "Liability under the state-created-danger theory is predicated upon affirmative acts by the state which either create or increase the risk that an individual will be exposed to private acts of violence." Id. If *576 the government plays a role in creating a situation that could give rise to an attack by private persons, it is obliged to prevent such injury. See id. The focus, then, is not necessarily on later governmental inaction, but rather on the initial act of creating a dangerous situation for private violence. In other words, "[i]f the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as it if had thrown him into a snake pit." Id. (quoting Bowers v. DeVito , 686 F.2d 616, 618 (7th Cir. 1982) (J. Posner, writing) ). However, there are an infinite number of innocuous government activities that could increase a person's risk for danger from private attacks. For example, if a city plants a shrub in the park, a mugger could use it as cover to ambush unsuspecting guests. See e.g. Schroder v. City of Fort Thomas , 412 F.3d 724, 728-29 (6th Cir. 2005) (featuring an alleged state-created-danger claim based on the city's creation of a street and setting the speed limit to 25 miles-per-hour). To prevent every act of municipal groundskeeping from turning into a potential constitutional claim, there are three limitations on the state-created-danger doctrine that prudently limit its use. To prove a due process claim on a state-created-danger theory a plaintiff must show three things: (1) an "affirmative action" (2) that creates a foreseeable risk of (3) a "special danger" McQueen v. Beecher Cmty. Sch. , 433 F.3d 460, 464-470 (6th Cir. 2006). Consider how those elements apply here.
Montgomery's failure to supervise the players was not an affirmative act. As soon as Montgomery arrived at the cabin, Plaintiffs assert he left the players virtually unsupervised while they were downstairs. Obviously, Plaintiffs here would portray this conduct as Montgomery's affirmative act of deciding to leave the players unsupervised, however the failure to supervise students is not an "affirmative act." McQueen , 433 F.3d at 466. Indeed, even a teacher walking out of a room leaving children unsupervised is not an "affirmative act" under the state-created-danger doctrine. See e.g. id. Instead, Plaintiffs will have to go back in the timeline of events to find an affirmative act; nevertheless, no prior affirmative acts will suffice here because the prior acts did not carry a foreseeable risk to the players. Before reaching that discussion, however, the Court will quickly dispose of the "special danger" element here.
A "special danger" merely means "the state's actions place the victim specifically at risk," as opposed to a risk "that affects the public at large." Id. at 468. The danger does not even have to be specific to a single individual, but can be particular to an identifiable group. Because the alleged conduct in this case was specific to the players on OHS varsity basketball team who went on the tournament trip, that is the relevant group. This is sufficiently particular to meet the special danger requirement. See id. (holding if the "relevant group included everyone in the school, the special danger requirement still would be met.").
Next, to demonstrate a state-created-danger claim, there must be some culpability on the state actor's part. The affirmative governmental action must have been "so 'egregious' that it can be said to be arbitrary in the constitutional sense." McQueen , 433 F.3d at 469. To make this determination, when the state action was not a "split-second decision," courts apply a "subjective recklessness" standard. Id.[7]
*577 An official acts with "subjective recklessness" if he acts in the face of an "inference" that a risk for "serious harm " exists and he is aware of it. Id. (emphasis added). To make that showing, the plaintiff must do so "circumstantially" and proffer evidence that would permit a reasonable fact finder to conclude that the risk of "serious harm" ... "was so obvious that the official had to have known about it." Id. Here, because his failure to supervise the players was not "an affirmative action," the Plaintiffs will have to look to Montgomery's prior acts to support a state-created-danger claim. Id. at 466. It could be argued that Montgomery's "action" was his decision to take the team on a school trip to Gatlinburg and stay there overnight. It can also be argued that he took an affirmative action by permitting Students A, B, and C to attend the trip despite their disciplinary records and prior hazing. However, for reasons already explained, prior to the trip it was not "so obvious" Students A, B, and C were a danger and would "seriously harm" their teammates. See id. at 469. Further, there is a factual question regarding whether Montgomery could even access the students' disciplinary records prior to the trip. The Individual Defendants argue the Family Education Rights and Privacy Act (FERPA) legally prevented him from accessing the records. [Docs. 172 & 176 at 16]. Regardless of whether Montgomery improperly accessed the players' records, irrespective of FERPA, or knew of students' actions outside of those records, the claim would still fail. "Although [defendant] was [possibly] aware of [Students A's, B's, and C's] disruptive and violent behavior, no reasonable fact finder could conclude [he] knew" the students would cause "serious harm" by using a pool cue to sexually assault freshman players or inflict grave physical injuries on Doe. Id. As such, Plaintiffs have failed to raise a genuine issue of material fact as to the state-created-danger claim. Accordingly, Plaintiffs claims against Montgomery will be dismissed. The Individual Defendants Motions for Summary Judgment [Docs. 172 & 176] are GRANTED .
3. Assistant Principal/Athletic Director Jess Naydley
Plaintiffs' claims against Naydley will also be dismissed. The evidentiary record does not contain sufficient factual evidence for a jury to reach a reasonable conclusion that Naydley violated Doe's and Roe's constitutional rights. As evidence, Plaintiffs assert that one former player and a player's parent once contacted Naydley to report team bullying. [Doc. 184 at 7]. Plaintiffs also claim Naydley could often hear players "horse playing" in the team locker room because his office was located in close proximity. Further, relying on Bullard's and another expert's conclusory statements, Plaintiffs assert varsity team rackings "dat[ed] back through Nayadley's tenure" as Athletic Director and his time as the varsity team's Head Coach, and "beyond." [Id. ]. Apparently, the Plaintiffs believe this is evidence Nayadley had actual knowledge of team gender-based discrimination. However, the Court finds the assertions fail to support a reasonable inference regarding Naydley's knowledge of student-on-student gendered bullying. Without such knowledge, Naydley cannot *578 be liable for being constitutionally deliberately indifferent to gender based harassment. Accordingly, Plaintiffs have failed to raise a genuine issue as to the § 1983 claims against Naydley. The Individual Defendants Motions for Summary Judgment is GRANTED [Docs. 172 & 176] as to this issue.
4. Principal James Jarvis
Jarvis's actions did not violate Doe's or Roe's constitutional rights. Jarvis's alleged constitutional error was that he refused to "contact any player's family 'unless he had news for them regarding the upcoming basketball season.' " [Doc. 184 at 8]. To be clear, it is not the Plaintiffs' assertion that they were never notified of the assaults; they admit they were.[8] Jarvis's inaction, instead, is in regard to his refusal to conciliate the players (including non-victims) and their families. [See e.g. Doc. 178-3, Bullard's Report, at 14 (holding "Someone from [the school] should have reached out to the [players'] families to extend support," and "Jarvis failed to understand the need to reach out..."] ). This refusal so frustrated the Department's "independent investigator," Courtney Bullard, that she asked the Department's attorney, Scott Bennett, to try to convince Jarvis to contact the players' families. [Doc. 184 at 8]. After he likewise failed to encourage Jarvis to do so, Bennett claimed he was "about ready to shoot Jarvis in the head," and that "no other principal in the 'entire district' would take [Jarvis's] stance." [Id. at 8-9]. Plaintiffs claim this is evidence Jarvis violated the United States Constitution. [Id. ]. That assertion is misplaced, however. Although Plaintiffs base their claims on equal protection grounds, "[plaintiffs] cannot premise a deliberate indifference equal protection claim on [a defendant's] supposedly rude ... behavior." Stiles , 819 F.3d at 853. There is no constitutional right, so far discovered, that entitles a person to compassionate state actors, and the equal protection clause " 'does not require that [a defendant] ... have a pleasant demeanor' in responding to harassment, but only that he respond to it in a manner that is not clearly unreasonable.' " Id. (quoting Port Huron , 455 F. App'x at 620 ). Jarvis's refusal to "reach out" to the players' families may have been inconsiderate or boorish, but it was certainly not unconstitutional. Further, his refusal to contact the players' families was not deliberately indifferent because it did not " 'cause [the victims] to undergo' harassment or 'make them liable or vulnerable to it.' " Vance , 231 F.3d at 260 (applying deliberate indifference under Title IX); see also Stiles , 819 F.3d at 852 ("The deliberate indifference standard used for proving a § 1983 equal protection violation in peer harassment cases is 'substantially the same' as the deliberate indifference standard applied in Title IX."). Accordingly, the Plaintiffs' claims against Jarvis fail as a matter of law. The claims against Jarvis will be dismissed, and Individual Defendants' Motions for Summary Judgment [Docs. 172, & 176] are GRANTED in this regard.
5. Coordinator Marsha Drake
Likewise, the Roes' claims against Marsha Drake are due to be dismissed as a matter of law. It seems the Roe Plaintiffs believe Drake is financially liable for Roe's damages simply because she was the Department's "Title IX Coordinator." They claim she failed to "learn [her] job" and fulfill her duties. [Doc. 183 at 15]. It *579 has long been established, however, that "only recipients of federal funds may be liable for damages under Title IX." Soper , 195 F.3d at 854. Title IX liability is premised on the notion that federal fund recipients consent to liability for private money damages when receiving said funds. Plaintiffs have not alleged facts showing Drake directly received federal funds or that she otherwise consented to be liable for money damages under Title IX. Additionally, although Drake had Title IX duties, her duties were owed to the Department. Her role was to coordinate the Department's Title IX compliance. See 34 C.F.R. § 106.8(a) (holding "recipients shall designate" an "employee to coordinate [the school's] efforts to comply with and carry out its responsibilities" for certain obligations under Title IX). Her obligations were derivative of the Department's, and she did not owe duties directly to the Department's students or Roe in particular. As such, Plaintiffs' arguments fail as a matter of law. The Department's Motion for Summary Judgment will be GRANTED in part , as to the § 1983 claims against Marsha Drake.
6. The Department - Monell Liability
"Persons" under § 1983 cannot be held vicariously liable. Monell v. Dep't of Soc. Servs. of City of New York , 436 U.S. 658, 692, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Instead, plaintiffs must demonstrate defendant's action (or inaction in the face of a duty) violated the Constitution. Id. As it applies in the educational context, the plaintiff must show: (1) a deprivation of a constitutional right (2) that the school is responsible for. Ellis v. Cleveland Mun. Sch. Dist. , 455 F.3d 690, 700-01 (6th Cir. 2006). When claims are brought against local governmental entities, such as the Department here, the plaintiff must demonstrate the municipality caused the alleged constitutional violation through an official department "policy" or "custom." Id. at 690-91.
If a governmental entity fails to train its agents, it can be considered a governmental "policy" supporting liability under § 1983 under certain circumstances. City of Canton, Ohio v. Harris , 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). "[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious , and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [government entity] can reasonably be said to have been deliberately indifferent to the need." Id. at 390, 109 S.Ct. 1197. However, it is not sufficient to allege that training was "negligently administered." Id. at 391, 109 S.Ct. 1197. "Neither will it suffice to prove that an injury or accident could have been avoided if an [employee] had better or more training, sufficient to equip him to avoid the particular injury-causing conduct." The relevant question, instead, is whether an injury would "have been avoided had the employee been trained under a program that was not deficient in the identified respect?" Id. In sum, to show inadequate training a plaintiff must demonstrate:
(a) the training or supervision was inadequate for the tasks performed;
(b) the inadequacy was the result of the [school district's] deliberate indifference; and
(c) the inadequacy was closely related to or actually caused the injury.
Ellis , 455 F.3d at 700-01.
Plaintiffs allege the Department failed to properly train its staff, particularly Montgomery, and that this constituted a department policy of deliberate indifference to training. The Sixth Circuit "has identified two situations justifying a conclusion *580 of deliberate indifference in claims of failure to train or supervise." Id. "One is failure to provide adequate training in light of foreseeable consequence that could result from a lack of instruction." Id. (quoting Brown v. Shaner , 172 F.3d 927, 931 (6th Cir. 1999) ). For example, it would be deliberate indifference for a city not to "train its police officers in the use of deadly force because it is obvious that the officer will need to use such force when they are armed with guns and required to arrest fleeing felons." Id. "A second type of ... deliberate indifference is where the city fails to act in response to repeated complaints of constitutional violations by its officers." Id. (quoting Brown , 172 F.3d at 931 ). Because here there is no evidence in the record of "repeated complaints of constitutional violations," the Court finds that in order for Plaintiffs to succeed on this claim, they must do so by showing the Department disregarded an obvious need for training.
Plaintiffs claim bullying at OHS was rampant. [Doc. 179 at 8]. In a 2013 survey, over half of OHS students reported being bullied at school. [Id. ]. Given this, it is more than likely the Department's staff and teachers at OHS would encounter students bullying one another, or at least receive complaints to that effect. On the other hand, not all schoolhouse bullying is discriminatory on the basis of gender or some other suspect class, which is what the Constitution and Title IX are ultimately concerned with. However, given the amount of bullying that occurred here, it was important for the Department to train OHS staff on how to not only reasonably respond to common bullying, but to also be able to distinguish more insidious forms of discriminatory harassment that occurs on the basis of some immutable characteristic, such as biological sex. It is these discriminatory forms of harassment that require increased school vigilance and a heightened response to ensure compliance with the demands of equal protection and the mandates of Title IX.
Here, Department failed to adequately train OHS staff and teachers. Montgomery, for instance, claimed he never received any training on student-on-student discriminatory harassment, or training on Title IX and its requirements. [Doc. 179 at 10]. More specifically, Montgomery explained he was never instructed how to recognize student-on-student sexual harassment. [Id. ]. Although the Department claims it conducted bullying and Title IX trainings at OHS, Plaintiffs proffer evidence that these trainings were not only substantively inadequate, often being brief and not detailed, but also never involved staff beyond a small number of administrators, many of which were no longer with the school at times relevant to this case. [Doc. 192 at 18-20]. Montgomery certainly did not attend any of these trainings. The Court is sympathetic to the fact that schools have many obligations to students, and that choosing among the many relevant trainings-ranging from academics to school shooters-often involves unfortunate zero sum options, requiring some trainings to be left out due to financial and time constraints. With that being said, if a school district employee has served a school in a capacity that often puts them in close proximity to students, and they serve in that role for any significant length of time, at least some acquaintance with Title IX and student-on-student harassment training seems to be at least minimally necessary. Yet here, Montgomery, despite serving at the school for almost six years prior to the sexual assaults, claims he never received any such training. A reasonable fact finder could conclude this was a result of the Department's deliberate indifference to an obvious need for relevant Title IX and student-on-student harassment *581 training. Further, it would not be unreasonable for a jury to conclude that this failure was causally related to Doe's and Roe's injuries.[9] Accordingly, the Department's Motion for Summary Judgment [Doc. 177] is DENIED . However, because there are genuine issues of material fact regarding what Montgomery knew in regard to the sexual assaults, the failure to train claim cannot be resolved at the summary judgment stage. Resolving those factual questions is necessary to a finding of causation under the failure to train claim. As such, the Plaintiffs' Motions for Partial Summary Judgment is likewise DENIED .
C. Tennessee Governmental Tort Liability Act Claims
Under Tennessee law, governmental entities are immune to suits for injuries arising out of governmental functions. Tenn. Code Ann. § 29-20-201(a). This immunity is removed in specific, enumerated circumstances set forth in the Tennessee Governmental Tort Liability Act (TGTLA), Tenn. Code Ann. § 29-20-202-05. The Department is a governmental entity within that statute. Among the statute's provisions, an entity's immunity is removed in suits for injuries "proximately caused by a negligent act or omission of any employee within the scope of his employment." Id. at §§ 205. Plaintiffs assert Defendants are liable for tort claims under this subsection.
Applying the TGTLA to this case raises many novel state law questions. First, under the TGTLA's employee negligence exception to the waiver of government immunity, some Tennessee courts have held that it does not apply if the employee was "gross[ly] negligen[t]," as opposed to simply negligent. See Fitzgerald v. Hickman Cty. Gov't , No. M2017-00565-COA-R3-CV, 2018 WL 1634111, at *5 (Tenn. Ct. App. April 4, 2018) (citing Autry v. Hooker , 304 S.W.3d 356, 364 (Tenn. Ct. App. 2009) ). Montgomery's negligence, if any, could arguably be considered gross negligence, depending on how the facts are construed. The Tennessee Supreme Court has not clearly adopted the gross negligence exception, so it is not clear whether the Court should apply it here.
There are other ambiguities in applying the exceptions to waiver of government immunity under these facts. There are nine exceptions to the removal of immunity for an employee's negligent act or omission. Id. at §§ 205(1)-(9). One relevant here is the "intentional torts exception," which excepts the waiver of immunity for injuries arising out of specifically enumerated intentional torts. See Limbaugh v. Coffee Med. Ctr. , 59 S.W.3d 73, 79 (Tenn. 2001). Among those listed is one for injuries arising out of "civil rights." Tenn. Code Ann. § 29-20-205(2). When federal courts apply TGTLA's civil rights exception to the waiver of immunity, they have held the term "civil rights" refers to claims brought for violations of "constitutional rights," particularly constitutional torts brought under § 1983. Savage v. City of Memphis , 620 F. App'x 425, 429 (6th Cir. 2015). Because the § 1983 claims against Individual Defendants will be dismissed, all that will remain are the Title IX and failure to train § 1983 claims against the Department. This raises multiple issues. First, because Montgomery's § 1983 claim for deliberate indifference will be dismissed under qualified immunity, does the claim still constitute an injury arising out *582 of a "civil right[ ]," excepting the removal of immunity? It is not clear.
Further, it is unclear whether Title IX is a "civil rights" claim as that term is used by the TGTLA. Because Title IX was enacted pursuant to Congress' spending clause power rather than its Fourteenth Amendment enforcement power, the law does not protect constitutional rights, at least not directly. Rather, it is more appropriately viewed as a contractual condition to the receipt of federal funds. Gebser , 524 U.S. at 284, 118 S.Ct. 1989 ("Title IX's contractual nature has implications for our construction of the scope of available remedies."). If the Court takes the traditional route and finds only constitutional rights are "civil rights" as defined by TGTLA, the Title IX claims would not fit the definition. Title IX, however, is often thought of as a "civil rights statute" and considered part of the various laws enacted and codified under the nomer "Civil Rights Act," which most often includes laws passed pursuant to Congress' commerce power that forbid discrimination on the basis of race, gender, and religion. See Doe by and through Doe v. Jackson Madison Cty. Bd. of Educ. , No. 17-01174-STA-egb, 2018 WL 2927777, at *4 (W.D. Tenn. June 7, 2018) (collecting cases). It is not clear whether TGTLA contemplates such discrimination laws under its "civil rights" exception. See e.g. Sneed v. City of Red Bank, Tenn. , 459 S.W.3d 17, 27 (Tenn. 2014) (implying claims arising under the THRA, Tennessee's version of the federal Civil Rights Acts, are claims for "civil rights" under TGTLA); Autry , 304 S.W.3d at 364 ("Autry's injuries arise from ... her claims of sexual harassment, i.e. , a violation of Autry's civil rights."); but see Fitzgerald , 2018 WL 1634111, at *6 (holding "workplace harassment is not specifically enumerated among the intentional torts for which immunity is not removed in section 29-20-205.").
Not only will application of the TGTLA to this case involve novel questions of statutory interpretation, the law imposes procedural requirements that will impede judicial economy and conflict with the Court's constitutional obligations. The TGTLA requires the tort claims be tried without a jury. Tenn. Code Ann. § 29-20-307 ; see also Young v. City of LaFollettee , No. E2013-00441-COA-R9-cv, 2014 WL 545486, at *6 (Tenn. Ct. App. Feb. 10, 2014) (disagreeing with a federal district court's holding that TGTLA claims could be tried by jury if coupled with Title VII claims). This would require the Court to bifurcate trial and hold a second bench trial for the TGTLA claims after the Title IX and § 1983 claims are resolved by a jury. The Seventh Amendment to the United States Constitution, on the other hand, requires federal courts to try cases by jury in civil "common law" suits where the amount in controversy exceeds "twenty dollars." U.S. Const. amend. VII. As to the claims against the Department, the Seventh Amendment would not apply and a bench trial would be permissible. See Lehman v. Nakshian , 453 U.S. 156, 160, 101 S.Ct. 2698, 69 L.Ed.2d 548 (1981). This is because at common law immunity exempts sovereigns and their extensions from suit, and if a suit is permitted it must be made in strict accordance with the waiver of immunity, including requiring a bench trial.[10] Id. When it comes to the TGTLA
*583 claims against the Individual Defendants,[11] the Seventh Amendment does require the Court to conduct trial by jury. See City of Monterey v. Del Monte Dunes at Monterey, Ltd. , 526 U.S. 687, 709, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999) (applying § 1983 claims held statutory claims that "sound in tort" and filed against government agents require a jury trial under the Seventh Amendment). These conflicting obligations impose significant costs on judicial economy.
When exercising federal question jurisdiction and presented with state law claims that present "novel or complex issue[s] of State law," "district courts may decline to exercise supplemental jurisdiction." 28 U.S.C. § 1367(c)(1). As discussed, the TGTLA claims here introduce multiple complex and novel legal issues, and are dependent on interpreting state law, many of which are questions of first impression. Federal courts should avoid making "needless decisions of state law ... both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." United Mine Workers of Am. v. Gibbs , 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). There are other reasons to decline jurisdiction over the TGTLA claims.
Under the TGTLA, Tennessee "circuit courts shall have exclusive original jurisdiction over any action brought" for TGTLA claims. Tenn. Code Ann. § 29-20-307 (emphasis added). "[T]he Tennessee legislature expressed a clear preference that TGTLA claims be handled by its own state courts. This unequivocal preference of the Tennessee legislature is an exceptional circumstance for declining jurisdiction." Gregory v. Shelby Cty., Tenn. , 220 F.3d 433, 446 (6th Cir. 2000). Accordingly, the Court declines to exercise jurisdiction over Plaintiffs' TGTLA claims. The issues would be better resolved in Tennessee's courts. Accordingly, Plaintiffs TGTLA claims are DISMISSED without prejudice with leave to refile the claims in state court.
IV. CONCLUSIONS
For the reasons stated herein-
• There is sufficient evidentiary support for Plaintiffs' Title IX claims. Accordingly, the Department's Motion for Summary Judgment [Doc. 177] will be DENIED as to that issue.
• Due to factual questions regarding Doe's and Roe's sexual attack, Plaintiffs' Motion for Partial Summary Judgment [Doc. 178] will be DENIED .
• Because the Department acted reasonably after the sexual assaults, the Department's Motion for Summary Judgment will be GRANTED in that regard.
*584 • The § 1983 claims against the Individual Defendants and Marsha Drake lack evidentiary support, and qualified immunity applies to the claims that are otherwise factually supported. The Department's and the Individual Defendants' Motions for Summary Judgment will be GRANTED as to those claims.
• Plaintiffs presented evidence creating a genuine triable issue regarding the § 1983 claim against the Department for its failure to adequately train employees and staff. The Department's Motion for Summary Judgment [Doc. 177] is DENIED on that issue.
• The Individual Defendants and Marsha Drake are immune from suit under TGTLA. Accordingly, all claims against Individual Defendants are due to be dismissed, and the Individual Defendants' Motions for Summary Judgment [Docs. 172 & 176] are hereby GRANTED . Likewise Department's Motion for Summary Judgment [Doc. 177] is GRANTED in parts relevant to the claims against Marsha Drake.
• The Court declines to exercise jurisdiction over Plaintiffs TGTLA claims. Those claims will be DISMISSED without prejudice .
SO ORDERED this 6th day of August, 2018.

Although Oncale is a Title VII case, the Sixth Circuit has instructed that Title VII cases defining whether harassment is "on the basis of sex" are informative in Title IX cases. Tumminello , 678 F. App'x at 284 ("The boundaries of 'on the basis of sex' have been more extensively analyzed under Title VII jurisprudence, which often is consulted when interpreting and applying Title IX.") (citing Fuhr v. Hazel Park Sch. Dist. , 710 F.3d 668, 673 (6th Cir. 2013) ).

Plaintiffs assert an independent report commissioned by the school concluded that Roe's attackers were motivated by "sexual intent." [Doc. 141 at 6 (citing Doc. 178-3 at 12) ]. The independent report, however, did not say as much; rather it concluded the "assailants had the intent to ... sexually harass the victims." This is a legal conclusion, not a factual determination of the assailant's intent. As such, it does not resolve this factual issue. Further, there is evidence the harassers were not motivated by sexual desire. For example, Doe, when asked whether his attacker intended his rape to be a "sexual act against you," answered "no." [Doc. 178-2 at 122].

Excerpt from Doe's Deposition: "Q ... "Was [Student B] homosexual?" "A No. Not that I knew of." "Q So I guess that's where I'm going with this question of is this sexual in nature. Was he doing this as a sexual act against you?" "A No. I feel like he tried to make me - belittle me. Like tried to make me feel like less than a man, less than him." [Doc. 178-2 at 122].

The Second Circuit recognized "name-calling in school which implicates a student's sex does not in itself permit an inference of sex-based discrimination," see also supra part (a) (finding the same), but found "we cannot exclude the possibility that such name-calling in the context of a reported rape constitutes sexual harassment." Id. As such, the court found a reasonable fact finder could conclude the secondary harassment, in itself, was actionable sexual harassment under Title IX, if causally related to the plaintiff's rape. Id.

While Stiles 's rule does hold that the actual knowledge of a single school "administrator" is sufficient , it is silent on whether an administrator's knowledge is necessary. See 819 F.3d at 848.

Plaintiffs also cite an Eleventh Circuit case that holds "lesser harassment may still provide actual notice of sexually violent conduct, for it is the risk of such conduct that the Title IX recipient has the duty to deter." Doe v. Sch. Bd. of Broward Cty., Fla. , 604 F.3d 1248, 1258 (11th Cir. 2010). Broward County was a Gebser case involving a high school teacher's alleged sexual assault of his fifteen-year old student, the plaintiff. Id. at 1250. Prior to him sexually assaulting the plaintiff, two students on separate occasions had complained that the teacher had sexually harassed them. Id. 1250-53. The Broward court found the two prior complaints of sexual harassment were sufficient to satisfy the plaintiff's "burden of raising a material issue of fact on the issue of actual notice." Id. at 1259. The court reasoned a fact finder could view the prior complaints collectively and find it "provided actual notice ... of a pattern of sexual harassment and a series of related allegations occurring over a period of nine months in [the teacher's] classroom." Id. Accordingly, the "lesser harassment" referred to in Broward was not generalized hazing or horseplay, but prior allegations of sexual harassment. See id.

The McQueen court also uses the term "deliberate indifference" when applying this standard. 433 F.3d at 469. However, the way the standard is applied in this context is materially different than as it is applied under Title IX and equal protection claims. Under those claims, deliberate indifference requires "actual knowledge," but under a state-created-danger claim deliberate indifference can involve less culpable behavior, such as acting with disregard to a "substantial risk" of harm. Accordingly, the Court will use the term "subjective recklessness" to avoid confusion.

The Roes acknowledged they received notice of Roe's sexual assault when he was returning home from the basketball tournament. [Doc. 183 at 12]. Their grievance is that the Department "failed to offer any explanation, comfort, or counseling to Roe." [Id. ].

Even though the equal protection deliberate indifference claims against Montgomery will be dismissed on qualified immunity grounds, this does not alleviate the Department from liability under Monell. See Doe v. Sullivan Cnty., Tenn. , 956 F.2d 545, 553-55 (6th Cir. 1992) (holding if claims against individual defendant officers are dismissed under mere qualified immunity, a municipality may still be liable under Monell )

Entities imbued with state power do enjoy some common law sovereign immunity for their governmental functions. See Owen v. City of Independence, Mo. , 445 U.S. 622, 645, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). Of course, this can be waived. The Title IX conditions on funding is such a waiver. But, Congress can also abrogate this immunity through its authority, and has in fact done so under § 1983, which is why the Department can be held liable under that statute. Id. (holding a "municipality's 'governmental' immunity is obviously abrogated by the sovereign's enactment of a statute making it amenable to suit. Section 1983 was just such a statute."). As to Plaintiffs' tort claims, Tennessee has not carte blanche waived or abrogated immunity for school board or departments, and as such, any claims for torts against a Tennessee governmental entity must be consistent with the TGTLA, meaning a bench trial would be a requirement under the common law principles of sovereign immunity.

Depending on whether the Department's immunity is waived, the employees may be held liable under the TGTLA. See Colson v. City of Alcoa, Tennessee , No. 3:16-CV-377, 2017 WL 4019596, at *12 (E.D. Tenn. Sept. 11, 2017). Typically, employees enjoy immunity under the statute, but this immunity is unavailable if the governmental entity retains its immunity. See id.